**PRUITT v. STATE.**

No. A–11891.

Criminal Court of Appeals of Oklahoma.

April 28, 1954.

Harland A. Carter, Okmulgee, John L. Ward, Jr., Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., Edgar R. Boatman, County Atty., Okmulgee County, Okmulgee, for defendant in error.

BRETT, Judge.

The plaintiff in error Robert Odell Pruitt, defendant below, was charged by information in the district court of Okmulgee county, Oklahoma, with the crime of murder allegedly committed on April 24, 1952, against Maurine Howard Pruitt in the aforesaid county and state. The information more specifically charged that the said defendant did with a premeditated design to effect the death of one Maurine Howard Pruitt, strike, beat, hit and club the said Maurine Howard Pruitt on the forehead with a blunt instrument and did shoot and discharge one bullet into the head of her, the said Maurine Howard Pruitt, from a certain loaded, .22 rifle, to wit: a .22 calibre bolt action Ranger, from which wounds so inflicted Maurine Howard Pruitt did die. He was tried by a jury, convicted, and his punishment fixed at life imprisonment; judgment and sentence entered accordingly, from which this appeal has been perfected.

The conviction in this case is predicated entirely upon circumstantial evidence. Briefly the facts in substance are as hereinafter set forth. On the morning of April 24, 1952 the police received a call to come to the home of the defendant, where upon arriving at said place they found Maurine Pruitt wife of the defendant in her bed, in a pool of blood, from a bullet hole in her forehead apparently inflicted by a .22 rifle lying on the bed to the right of her body. The muzzle of the gun was near her hips pointing to the head of the bed, and her hand if her arms were long would extend down on the barrel about 12 inches one of the officers indicated. Mrs. Pruitt had been shot in the left forehead, and there were contusions and lacerations to the right of the bullet hole. The defendant informed the police that his wife had shot herself. When the officers arrived the Pruitts' daughter 9 years old, was asleep in the front bedroom, where she and her father had slept. The police officers asked Pruitt if he knew of any reason why she shot herself, and he replied, "Well, she is crazy; she reads the Bible all the time, if you don't believe she is crazy look at some of the literature she reads over there all the time". One of the officers said they found a Bible on the table but that they did not look into

the table drawer for any other literature. All they thought about was to get her to the hospital. They testified in substance that Pruitt had his wife arrange to talk to a psychiatrist. The police said he told them he got up at 5:30 and turned off the alarm clock. The officers testified Pruitt stated he heard his wife groaning, opened the door and saw the blood and then called the officers. The officers testified they asked him if he called them immediately when he first discovered his wife's condition, and he replied that he did. One of the policemen testified that he stated, "Well, its after 6:00 o'clock now". The officer related that Pruitt said, "Well, it might have been a little longer. I fooled around, put out the dog and fed the rabbits". He told the officers he asked the desk sergeant to call the ambulance. The ambulance arrived shortly after the officers. The policemen stated they asked Pruitt if he and his wife had had trouble. The reply, they testified, was "ever since we have been married. We had hell again last night". In this connection it is well to note that the little 9 year old daughter testifying for the defendant swore positively that her father and mother had no trouble the night before the killing. The defendant testified for himself and was asked no questions on this subject. He testified to the sole question, "Did you kill Maurine Pruitt?" to which his reply was, "Absolutely not". The policemen testified the defendant said he may have heard the shot, but he thought it was an insecure slat that fell out of the bed. The daughter testified she heard a noise and she thought that what she heard was a slat falling out of the bed. The record shows the police received the call at 9 minutes to 6:00 o'clock. The police testified the defendant told them no one was there but himself, his wife and daughter the night before. The police took no measurements and made no diagram, or notes on the conditions they found at the scene of the crime, or as to the conversation with the defendant. A pencil, a pad and a steel tape next to his pistol should be an officer's chief accessories. The officers didn't know how long the bed was, how long the rifle was, how far from the head of the bed the decedent's head was (though estimated about 9 inches), how far from the foot of the bed the butt of the gunstock was. The only thing they checked carefully was the windows and screens, which were locked and had been undisturbed. Chief of Police Holley who did not participate in the original investigation testified that the gun used in the killing was 43 inches long. The Chief said he did not know who killed Mrs. Pruitt.

The state's case in chief was predicated on the foregoing officers' evidence, autopsies and photographs made by Don Lindsey, commercial photographer. These photographs showed Mrs. Pruitt's forehead with the bullet hole approximately to the left of center, with two extending lacerations running up and down in a diagonal to the right of the hole, and to the right of these lacerations a half moon laceration shortly to the right of the more extended laceration from the bullet hole, but not connected therewith on the exterior.

The state's first medical witness was Dr. Hasselman of the Osteopathic Hospital, duly licensed and qualified. He did not perform the autopsy but examined Mrs. Pruitt, and testified as to the results of his examination that there was no connection between the radiating tears from the bullet hole and the laceration to the right of the bullet hole and lacerations connected therewith. He said it appeared solid flesh was between them. It was his opinion the half moon tear to the right of the bullet hole could have been inflicted by a blunt instrument, and it could not have been caused by the bullet wound. He admitted this was the first case he had where a bullet wound was in the head. He admitted he was not qualified to testify as to the resulting force of the gas from the shell in a contact wound. Dr. Hasselman said he did not know if this was a contact wound but was close. He said he did not know what might be the results in contact wounds. He testified that he could not find any cranial fracture below the wound supposedly produced by the blunt instrument.

Dr. Thomas Orr of the Osteopathic Hospital, who examined Mrs. Pruitt, testified for the state substantially the same as Dr. Hasselman, that the tear wounds to the right of the bullet hole in the forehead was made by a blunt instrument, and was not the result of the bullet wound. On cross examination however he testified that where the gun is held directly against the flesh the escaping gas would cause a break in the skin at some place, which would be an inch or two inches away. Dr. Orr finally admitted he was not an expert on bullet wounds.

■ Dr. McCauley, a duly licensed M. D., graduate of the Oklahoma University, testified for the state that he had occasion to examine bullet wounds and blunt instrument wounds. He related that he performed an autopsy on Mrs. Pruitt's head. He testified the hole in the head was made by the bullet and the laceration wounds to the right thereof could have been caused by a blunt instrument, and in his opinion was not caused by the bullet. He explained how the skin was removed from the scalp and that this procedure disclosed the fracture of the skull radiating from the bullet hole. He sawed the top of the skull off so as to expose the brain. He related that in the spinal column bump or occipital he found the .22 bullet. The wound to the right of the bullet hole on the decedent's forehead was about an inch away from the bullet hole. On cross examination he admitted that the gases from the gun, being forced through the skull could possibly have caused the fracture of the skull. He positively stated the fractures radiated from the bullet hole. Dr. McCauley testified it would have been impossible for Mrs. Pruitt to have inflicted the wound to the right of the bullet hole and then to have shot herself. He admitted he had been prohibited by the county attorney from talking to defense counsel about the autopsy about a week before the trial. The defendant of course has the right to talk to the state's witnesses.

Dr. L. W. Lowbeer, an M.D., a pathologist, graduate of the University of Vienna, licensed to practice pathology in the state of Oklahoma, affiliated with Hillcrest Hospital, Tulsa, Oklahoma, a Fellow of the American Medical Society and member of the faculty of the Oklahoma Medical School, whom the record reveals as an eminent authority with special training in post-mortems and autopsies, related he performed an autopsy on Mrs. Pruitt's head. The body had been embalmed when he performed his autopsy. He testified in substance that there was a stellate fracture of the skull. He said this could have been caused by a blunt instrument, but such fracture being inflicted the person receiving it could then not shoot himself with a gun. He related that it was his opinion that a small gunshot wound would not likely produce such a fracture as was found in this case. On cross examination he said it was unlikely but not impossible that such a bullet wound could produce the fracture found in this case. He admitted he had not participated in the first autopsy by Dr. McCauley, and had not removed the skin from the forehead and skull. He found no depression where the blow was allegedly inflicted by the blunt instrument. The doctor admitted that in a contact wound where the muzzle of the gun is placed against the forehead, that the explosion of the gun causes the gases to escape over the outer surface or through the skin, or under the surface. He testified the tears connected with the bullet hole were the result of the bullet being driven through at that point, and they had not been made by a blunt instrument. But it was his then conclusion that the hole was inflicted by the bullet, and the one on the forehead to the right of the hole was by a blunt instrument, which resulted in the fracture of the skull. In this connection the argument of counsel for the defendant discloses that the county attorney placed great emphasis on Dr. Lowbeer's testimony. No one saw the killing, and there being no other expert witness so pre-eminently qualified as Dr. Lowbeer the jury probably likewise placed great emphasis on his testimony.

■ Other than the foregoing evidence of statements made by the defendant as testified to by the officers, there is not one circumstance that connects the defend-

ant with the killing. Both proof of the corpus delicti, and proof that the defendant committed the crime may be established by circumstantial evidence. Gorum v. State, 60 Okl.Cr. 248, 63 P.2d 765.

The defendant offered evidence in his behalf; his chief witnesses were as follows:

He testified for himself as hereinbefore set forth, positively denying that he killed Mrs. Pruitt.

Dr. Clifford Allen, a brain surgeon, testified in substance, that a gun skin contact wound would break the skin some distance from the wound, and that this break would be caused by the force of concussion waves. The condition of the lacerated wound to the right of the bullet hole pictured in the photograph he said could have been caused by the force of the concussion either going in or coming out. In a contact wound you would find powder burns around the hole, as the pictures showed.

Dr. Robert L. Montague, Osteopathic surgeon, testified, Mrs. Pruitt was in menopause. He related he prescribed for her on April 22, 1952, that she was nervous and upset, and suggested she see a psychiatrist, one preferably in the Springer Clinic in Tulsa. About 30 minutes later she called by telephone stating that she had made an appointment but for about a week away. At the time of this call she was in a state of nervous frustration. She would cry and then laugh. She talked about doing away with herself. He said the wound on Mrs. Pruitt's forehead to the right of the bullet hole was the result of repercussion and vacuum force, caused by escaping gas both inside and outside the cranial vault. The bullet hole appeared to be a contact wound. Both wounds, he testified, were caused by the bullet and the escaping gases. It was his conclusion the wound was self inflicted.

In addition to the foregoing, proof given by Virginia Pruitt the 9 year old daughter, was to the effect her father and mother did quarrel some weeks before. She stated her mother cried a lot, more than a normal person. She testified she accompanied her mother to Dr. Montague's office. She said she never saw her father strike her mother. Her father, she said, told her her mother was mentally ill and to humor her and be calm with her.

Dr. E. M. Chedester, a veterinarian, and friend of the family, testified that Mrs. Pruitt came to his office and talked to him about her troubles. She was very nervous and in a hysterical frame of mind. He related Mrs. Pruitt said she was going down and jump off of the bridge and destroy herself. He further said she cried while at his place.

Helen Payne who worked at the cafe run by the Pruitts, testified, on April 22 when Mrs. Pruitt returned from Dr. Montague's she said before she would go to a psychiatrist she would jump off the bridge first.

There was substantial proof by good citizens of the defendant's reputation for being a peaceable and law abiding citizen. The evidence of the defendant's guilt as hereinbefore established is entirely circumstantial and is so close in our opinion it falls within the rule of Miller v. State, 57 Okl.Cr. 99, 45 P.2d 769, 770, wherein this court said:

"Cases resting entirely on circumstances sometimes are so near the border line that it is extremely difficult to say whether the circumstances proven are sufficient to establish guilt, so the rule has been many times stated that where a conviction rests on circumstantial evidence and circumstances are proven from which the reasonable and logical inferences of guilt clearly arise, and which exclude any reasonable hypothesis except the guilt of accused, although the evidence is conflicting, the verdict will not be disturbed by the appellate court. Halbert v. State, 35 Okl.Cr. 329, 250 P. 436. But where the circumstances are few and the case is close, and where there is proof of good character and a positive denial by defendant, the court will scrutinize the evidence and if upon the whole record it appears the circumstances proven do not fully satisfy the requirements of the rule stated, the conviction should not be permitted to stand."

This conviction presents such a borderline case that the slightest ground of substance should tip the scales in the defendant's favor. This ground is found in the defendant's motion for new trial on the ground of newly discovered evidence.

After the judgment and sentence herein entered on September 5, 1952, there was filed in this court on May 21, 1953 a motion for new trial on the ground of newly discovered evidence, which was denied by the trial court. This motion was predicated upon a restudy by Dr. Lowbeer of the photographic exhibits in the case as well as a revaluation of his findings in the autopsy performed by him. Being in doubt about his findings, he thereafter addressed a letter to the following outstanding pathologists of this country as follows, Dr. Richard Ford, M.D., Department of Legal Medicine, Harvard Medical School, Boston, Massachusetts; Dr. Alan R. Moritz, M.D., Western Reserve University, Cleveland 6, Ohio; Lester Adelson, M.D., Coroner's Office, 712 Lakeside N. E., Cleveland, Ohio; Dr. Milton Helpern, M.D., Deputy Chief Medical Examiner, City of New York, and Dr. Jakob Werne, M.D., Assistant Medical Examiner, City of New York. In this letter he stated in substance the facts testified to by the police officers, and other conditions in the case including the gist of his testimony, and expressed doubt as to his conclusions in the case. A sample of these letters, the one to Dr. Ford of Harvard, reads as follows:

"* * * A few weeks ago I was asked to testify for the State of Oklahoma in a very puzzling murder against suicide case in which I had performed or rather reviewed an autopsy previously performed by local doctors in a town fifty miles from Tulsa. Here is the story.

"One early morning, the police was notified by the defendant, a 46 year old white male, that he had found his wife, aged 45, dying on her bed with a bullet hole in her forehead and a .22 caliber rifle next to her. When the police and ambulance arrived, the woman was lying in a pool of blood and dying. She expired shortly thereafter. There was a bullet hole in her forehead but next to it a flap-like laceration of the skin was seen. This made the police suspicious of the statement of the defendant that his wife had shot herself. The defendant admitted that violent quarrels had taken place the preceding evening and on many previous occasions. It also was established that the defendant had taken care of various animals (dogs, rabbits) for forty-five minutes after discovering his dying wife before he called the police.

"For those reasons, the County Attorney ordered an autopsy, which was performed by two local physicians. These physicians noted the bullet hole in the skin of the forehead and to the right of it a semicircular laceration. After removing the scalp they noted a stellate fracture of the right frontal bone underneath the skin laceration, and a bullet hole of the bone to the left of it. They felt they were dealing with two separate traumas: one causing the laceration of the skin and radiating skull fracture underneath and the other trauma caused by the bullet. The bullet had traversed the brain and richocheted from the occipital bone into the cervical spinal canal where it was recovered by the physicians. The contention then was that the woman did not commit suicide but that the husband first hit her over the head with the blunt instrument causing the skin laceration and skull fracture and somewhat later fired a shot with a .22 caliber rifle in close proximity to the first wound in order to make it believed that she shot herself.

"For these reasons, the County Attorney wanted additional opinion and had the body moved to Tulsa following complete embalmment to have me review the case.

"I am enclosing my autopsy protocol, as well as two photographs taken by the police photographer. I subse-

quently testified in court in behalf of the state, producing the following arguments.

"1. The bullet hole does not constitute the center of the radiating fracture and is therefore not believed to be the cause of it. The center of the fracture is located underneath the semicircular skin laceration.

"2. It is unusual for bullet perforations of the skull to cause at the point of entrance long fracture lines radiating extensively towards and through the base of the skull as in this case.

"3. Bullet holes of entrance involving the skull are sharply outlined. The bullet hole in this case has ragged edges with the outer table chipped off, as if there would have been a preceding trauma (fracture) weakening the bone.

"4. One part of the fracture line bordering upon the bullet hole from below appears to be missing as if 'shot away.' It continues not from the left outer rim of the bullet hole but from that part of the outer table which has been chipped off. (See photograph).

"5. No communication was found between the bullet wound of the skin and the semicircular laceration.

"It was, therefore, claimed by the state that the defendant had first delivered a blow with a blunt instrument (perhaps butt of the rifle), thereby causing a semicircular tear of the skin and a radiating fracture of the skull (and also a contusion of the tip of the nose). Finding that his wife was not dead he later shot her, thereby causing a bullet perforation of skin and skull. This shot was fired very close to the laceration in order to simulate suicide.

"The state also claimed upon testimony of a gun expert that the wound was not a contact wound and that the decedent, who was of medium height, could not have shot herself with a rifle, the barrel of which measured 30″ from trigger to muzzle.

"The defense on the other hand claimed that this was a contact wound and that the force of the explosion caused the fracture, as well as the skin laceration.

"The jury found the defendant guilty and he was sentenced to life imprisonment.

"Despite my testimony, I have developed doubts about its validity and do not want the fate of perhaps an innocent man on my conscience. It is for this reason that I would like to elicit your expert opinion in this matter.

"Is it after all possible that this was a contact wound, and that the bullet caused the fracture itself? Would it perhaps be possible that contact was made between skin of the forehead and muzzle of the gun at the right edge of the bullet hole but not on its left edge? This would explain the blackening of the skin left of the bullet hole, which was absent to the right of it. It would also cause expansion of gases to the right side underneath the skin, which may have caused the semicircular laceration of the skin, despite the fact that neither I nor the two physicians who first conducted the autopsy found any direct connection between the two wounds. I was, of course, greatly handicapped by the fact that the body was completely embalmed and that the embalmer had done his best to restore the skin around the wounds.

"Your interpretation in this seemingly complicated matter will be very greatly appreciated."

Thereafter he received a reply from Dr. Ford, the pertinent part of which is hereinafter set forth:

"In regard to your five points on the second page of your letter:

"1. The fact that the bullet hole is not in the center of the stellate fracture is not a reason to believe that the bullet impact together with muzzle blast could not have caused the fractures

"2. On the contrary, it is usual for bullet perforations of the skull to cause long fracture lines radiating towards and through the base of the skull.

"3. Bullet holes of entrance usually are sharply outlined but occasionally are shelved outwardly rather than inwardly due to splintering of bone perhaps assisted by muzzle blast. Muzzle blast from a .22 caliber rifle is far from inconsequential.

"4. Just which portion of bone may be blown away as a result of gunshot injury is not predictable. * * *

"5. (* * * To support my disagreement with some of your reasons I enclose photographs of a series of cases. The 35 mm. lantern slide in color of a young man with a bullet wound in the center of his forehead is pertinent. He shot himself from a distance of an inch or so sitting in a chair in front of a mirror with the rifle propped up on books. The bullet passed between the two cerebral hemispheres in the sagittal fissure downward and backwards through the cerebellum and came to rest on a ridge of bone between the right and left posterior fossae. This he apparently achieved by back-sighting against his own image. You will notice that he has bled from the nose, from the right ear and into both orbits. This is the result of many radiating fracture lines from the wound of entrance down through the base of the skull in several directions. The second case is that of a Chinese who was bragging about his physical prowess, 'thumping his chest to prove his ruggedness, when a friend from across the room shot him in the forehead with a .38 caliber revolver. In the four pictures on this case you will see extensive fracturing from both entrance and skull exit wounds. The bullet is still present in mangled form in the hole in the posterior parietal bone on the left. The calvarium is fragmented. The fourth picture of this series shows the absence of fragments following removal by hand. Also, the second in this series shows some degree of outward beveling of the wound of entrance. In the first picture in the series on this Chinese case, you will observe above the bullet hole at the hairline on the left forehead an everted flap of skin this having resulted from a fragment of bone forced out at some distance from the entrance wound. In the third case there is a .22 caliber gunshot wound of entrance in the left occipital region. To the right of the midline and slightly higher there is a lacerated wound of the scalp. This resulted from a portion of the soft lead bullet shearing off and being deflected along the skull externally emerging through the scalp. The second picture in this series shows a probe indicating the path of this fragment through scalp but not through the deepest layer of the galea. This is the sort of thing that may be possible in the case in question. In the three pictures of the fourth case is a Coastguardsman found dead in the barracks with two gunshot wounds in the forehead. It was thought to be a murder but examination of the wound showed that again a bullet had split and a fragment slithered under the scalp to emerge at a distance.")

The foregoing in parenthesis is included herein only for the purpose of indicating the doctor's experience and knowledge, and not indicative of its admissibility in a new trial.

"There is no doubt at all from the photographs of the dead woman's forehead in your case that this is a wound of fairly tight contact. There is the usual circular defect of fairly large size consistent with muzzle blast having blown a plug of skin into the head. There is slight escape of powder residue on the left forehead. There is a double laceration extending from the edge of the central defect entirely consistent with blow-back of the skin and rupture of the skin due to the confined muzzle blast. * * *

"One final point. It is perfectly possible for a very small person, even a

child, to inflict a gunshot wound suicidally in the head with a 30 inch distance from trigger to muzzle. * * *"

The reply of Dr. Alan R. Moritz:

"* * * I have on several occasions seen secondary wounds in the skin near but not in communication with an entrance bullet wound in the skin which were produced by fragments of bone which were blown out by the expanding gases of contact fire. * * *"

The reply of Dr. Adelson who conferred with Dr. Gerber, the coroner of Cuyahoga county, Cleveland, Ohio, in part, found as follows:

"I read with considerable interest the detailed description and autopsy report regarding Mrs. Pruitt, and have taken the liberty of consulting with Dr. Samuel R. Gerber, the Coroner of Cuyahoga County concerning this case. Dr. Gerber has been Coroner here for the past 16 years and has had a wide experience in traumatic pathology. We have gone over the entire case together and the following are our comments and impressions.

"First, a brief review of the anamnestic data. The suspicions of the police were aroused apparently by the victim's forehead which presented what appeared to be two separate injuries, although the husband stated that she had shot herself and that he had not in any way molested her. This immediately raises the vital issue of the nature of the two injuries, and whether or not they could both have resulted from a single *near type gunshot*. This is a crucial point and we shall comment on it later. * * *

"The history of the quarrels and the time interval are irrelevant insofar as the *medical evidence* is concerned, and it is on the medical evidence that we wish to focus our major attention. * * *

"A laceration in the soft tissues of the forehead is not a necessary finding to establish that the semicircular injury is, in fact, the site of *exit* of something, solid or gaseous, from beneath. The muzzle blast could have traveled (or diffused, if you wish) between the soft tissues and the pericranium, elevating the soft tissues, and then burst forth through the skin, producing an exit type injury; not only muzzle blast (gas, fragments of powder etc.) but also a fragment of the bullet shaved off in its passage through the bone, spicules of bone and/or debris could have issued *from* the opening. The most important aspect of this crescentic injury is whether it represents the site of an impact sustained from the outside or whether it represents the site of exit of something from below. Our study of the pictures and of your description lead us to believe that it represents the site of *exit*. The irregular lacerations which you describe, and which are visible in the picture, suggest to us an explosive type of injury rather than a contused laceration resulting from mechanical violence applied to the outside. * * * Your description of the skin injury does not mention any abrasions of the margins, whereas in your autopsy description you delineate in detail the ragged tears extending peripherally. From all this we conclude that the crescentic laceration did *not* result from mechanical violence applied *directly* to this area from the outside.

"Thus the two separate injuries of the forehead could be produced by a single trauma, namely a *near type* gunshot wound. Two separate applications of force are in no way necessary to produce this combination of injuries. Although it may not be possible to rule out a second trauma, the entire picture is readily explained on the basis of a single *near* gunshot wound.

"The linear stellate fractures which are described and depicted are seen frequently with gunshot wounds of the skull. In our experience they are quite common. Again, a single trauma to the head, namely a gunshot wound, explains both the perforation of the

skull and the linear fractures. A blunt impact to the head which would produce such extensive linear fractures as are found in this case should be accompanied by some depression of the fragments immediately below the point of impact. However, there is no evidence whatsoever of depression either by description or in the photo. Moreover, had the skull fracture been sustained *prior* to the infliction of the gunshot injury, one might reasonably expect to find that large fragments of bone had been driven into the brain by the force of a bullet striking an already damaged and weakened skull. Thus we conclude that the irregular linear fractures of the skull are not of such a nature as to have been caused by a blunt impact. We are forced to the conclusion that they were produced by a mechanism which also explains the two separate skin injuries, namely a gunshot wound. Thus the statement of the defense counsel that this type of gunshot wound could cause the radiating fractures as well as the perforation of the frontal bone and the skin lacerations is *not* at variance with our experience in other instances of this variety of injury. Finally, in this same connection, bullet holes are rarely the center of the radiating fractures produced by the bullet. Almost always the hole is eccentric with respect to the center of the fracture itself. The combination of radiating fracture lines and perforation of the skull produced by a bullet probably results from the following mechanism * * * The bullet strikes the skull, producing the stellate fractures. (The impact of bullet on the bone momentarily halts the missile in its flight). It (the bullet) then continues on its flight and perforates the tables of the calvarium.

"The contusion of the nose which is described and illustrated could have arisen in any one of several ways;—

"a) Death was not instantaneous, and it is possible that the victim may have been thrashing around while *in extremis* and struck her nose with her own fist.

"b) The gun could have fallen on her nose after it was fired.

"c) Is it possible that the nasal injury was sustained the previous night during the argument or at some other time? * * *

"We feel that the distance of 30 inches between trigger and muzzle with a woman of medium build does not eliminate the possibility of her having fired the gun. Here we must categorically disagree with the opinion of the gun expert. We have done a few simple experiments with a gun of similar dimensions and have found it quite possible for a medium-sized woman to point the gun at her own head in the same direction as that in the case under discussion and to pull the trigger. * * *

"From the personal point of view, Dr. Greber and I both feel that on the basis of the medical evidence and the pictures there is 'reasonable doubt' about the case as a whole."

In this connection if the foregoing conclusion be correct, then the theory upon which this defendant was convicted was erroneous.

Upon receipt of the foregoing communications Dr. Lowbeer then wrote County Attorney Steele on November 17, 1952 as follows, in part, in regard to the pathological conclusions of the doctors aforesaid:

"Dear Mr. Steele:

"I feel it to be my moral and professional obligation and duty to present to you at this time a totally new interpretation of the Pruitt case derived at independently by five of the top medico-legal experts of this country whom I consulted because I developed increasing doubts about my previous interpretation. * * *

"This does not mean of course that the defendant could not have inflicted the fatal shot. It does mean however, that a conviction could not be based on the assumption that two independ-

ent traumas were involved, namely a blow *and* a shot. It was however this assumption that two traumas were involved, which in your opinion caused the Jury to declare the defendant guilty. This opinion is expressed in a letter of Mr. Combs of September 27:

" 'We feel that your testimony was instrumental in obtaining a conviction.'

"You may have additional reasons for the defendant's guilt, but his conviction should not be based on facts, the interpretation of which is fraught with so many doubts. * * *

"I am placing these new testimonies before you and suggest that you communicate them to the Judge in this case. I have felt it my moral and professional obligation to seek for expert opinion in this tragic case and to present you with this opinion despite the fact that it repudiates my own testimony. I feel it imperative that all involved parties be notified in order that justice may prevail in this tragic case. * * *

"No personal consideration must stand in the way of justice when a human life is at stake."

When Dr. Lowbeer received no communication he took the liberty of informing counsel for the defendant of this new evidence. Thereafter a stipulation of facts was prepared by Mr. Boatman the new county attorney, and counsel for the defendant, setting forth the facts relative to the newly discovered evidence. The matter was first presented to this court who directed it to be submitted to the trial court. This was done with a resulting denial, and it is now a part of the record on appeal.

 Upon the foregoing expert conclusions the motion for new trial on grounds of newly discovered evidence was filed as provided by law, Title 22 O.S.1951 § 953, within the next succeeding term, and the trial court had jurisdiction to entertain the motion, but if it had not been the court would not have had jurisdiction to grant the relief. State ex rel. Attorney General v. Stanfield, 11 Okl.Cr. 147, 143 P. 519; Young v. State, 39 Okl.Cr. 100, 263 P. 167; DeWolf v. State, Okl.Cr., 256 P.2d 191, certiorari denied 345 U.S. 953, 73 S.Ct. 871, 97 L.Ed. 1375. Therefore the only question presented herein is, did Judge Jess I. Miracle abuse his judicial discretion in refusing to grant a new trial on grounds of newly discovered evidence. It must be remembered that trial judge, the Honorable W. H. Blackbird, had been elevated to the Supreme Court, and Judge Miracle was called upon as his successor to pass on the motion for new trial. This presented a rather difficult situation from the defendant's standpoint as well as that of Judge Miracle. Ordinarily where the newly discovered evidence is cumulative, or for the purpose of impeachment the motion should be denied, Hathcox v. State, Okl.Cr., 230 P.2d 927; Ingram v. State, 87 Okl.Cr. 223, 196 P.2d 534; Bell v. State, 85 Okl.Cr. 150, 186 P.2d 344; but if it appears that had the newly discovered evidence been introduced on the trial, there exist a reasonable probability that a different result would have been reached, the motion may be granted, Williams v. State, 92 Okl.Cr. 70, 220 P.2d 836. Such is the situation involved in the case at bar. Herein the evidence of the defendant's guilt is entirely circumstantial, and this case is certainly a borderline case, the conviction in which we feel is largely predicated on Dr. Lowbeer's testimony. Dr. Lowbeer after the trial, haunted by good conscience, now repudiates his testimony and provides strong evidence for the defendant, in the opinions of outstanding pathologists to support his conclusions. This case falls squarely within the rule announced in Miller v. State, supra. Here as therein, there is a strong suspicion of guilt, but it is not conclusive. There is positive evidence that the decedent indicated she would destroy herself. Dr. E. M. Chedester was not even cross examined on that point by the state, neither was Helen Payne, who worked in the cafe with Mrs. Pruitt. The circumstances herein are close; there is proof of good character of the defendant; and a positive denial by him. Our situation is most acute in this case, the line between

guilt and innocence herein is so thin that we cannot in good conscience permit this conviction to stand. It has been said it is better that a hundred guilty men go free than one innocent man suffer an unjust conviction. It is more than likely that the new evidence by these pre-eminent pathologists would change the result of the case. Under these conditions it thus appears that the motion for new trial on the grounds of newly discovered evidence should have been sustained. The judgment and sentence herein is accordingly reversed, vacated and set aside and a new trial ordered.

POWELL, P. J., and JONES, J., concur.