Robert Odell PRUITT, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12194.

Criminal Court of Appeals of Oklahoma.

Nov. 16, 1955.

John L. Ward, Jr., Tulsa, Harland A. Carter, Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., Edgar R. Boatman, County Atty., Okmulgee, for defendant in error.

BRETT, Judge.

The Plaintiff in Error, Robert Odell Pruitt, was charged by information in the District Court of Okmulgee County, Oklahoma, with having committed the crime of murder on the person of his wife, Maurine Howard Pruitt, with a blunt instrument, and a certain loaded .22 rifle, on April 24, 1952; was tried, and pursuant to the verdict of guilty, was sentenced to life imprisonment.

This is a second appeal; the conviction in the former trial was reversed in this court; Pruitt v. State, Okl.Cr., 270 P.2d 351.

The conviction herein complained of is predicated entirely upon circumstantial evidence. The same was true in the former trial. The casemade herein is 1,077 pages in length. It is necessary that a condensation of the extensive evidence be detailed.

On the morning of April 24, 1952, at the hour of 6:09 o'clock, A.M., the police were called to the home of the defendant. Upon arrival, Officers Hendrickson and Carter, of the Okmulgee Police Department, were informed that the defendant's wife had shot herself. The officers were ushered into the decedent's bed room, originally a dining room, where she was observed lying on her bed, lengthwise, in a pool of blood, as the result of a bullet hole in her forehead which had been inflicted by a .22 rifle. The rifle was lying on the bed along her right side, with the muzzle near her hip; her right hand and the gun extending down towards the foot of the bed. The muzzle was near her right hand. The bullet wound was slightly to her left of the center of her forehead. On the right side thereof, about an inch away, were contusions and lacerations, which the information alleged were made by a blunt instrument. The officers were informed that there were no other persons present other than the decedent, the defendant, and their daughter, then eight years of age. Both the defendant and his daughter had slept in the front bed room, just to the right of the living room. The decedent's bed room opened into the living room without doors between the two rooms. Immediately back of the front bed room was a bath room, and behind that was another bed room used as a store room; behind the back bed room and the dining room bed room was the kitchen, and another room, and off of that, a porch. In the living room, just off of the front bed room was a table, and an alarm clock thereon. The defendant, a restaurant operator, used the clock to awaken him in the morning.

When the officers arrived at the home of the defendant, they asked him if he knew of any reason why she shot herself, and he answered "she was crazy", and stated she nagged him all of the time; (Officer Hendrickson said he told him this several times); that on occasions she would get up and turn off the alarm clock and cause him to oversleep, thus interfering with his business operations. He informed the officers, "if you don't believe she is crazy, look at the literature she reads over there on the table." The officers examined the table near her bed where they found a Bible and some other religious tracts and reading matter. The officers testified they asked if they got along, and the defendant informed them that, "we

have had trouble ever since we have been married, and we had hell again last night." The officers further related that the defendant informed them that the night before, they went to an establishment and got some ice cream for the little girl, and all the while his wife sat in the car and scowled at him, and laughed at him as though she had something on him. He told the officers they went home, and he and the little girl went straight to bed. The defendant informed them that he first discovered his wife's condition when the alarm clock went off at 5:30 o'clock, A.M., and he got up and shut it off. The alarm clock, it should be noted, was just to the right of the door from the defendant's bed room, into the living room, in the corner adjacent to the wide opening into the decedent's bed room. The defendant, in coming from his bed room to the clock, would be facing directly towards the bed on which Mrs. Pruitt slept, and on which she was found in a dying condition. If the foregoing facts were true, his observation of her would have been inescapable. (At this time of year, the sun rise is at 5:47 o'clock, A.M.) The defendant's daughter testified her father awoke by the alarm clock. The officers checked the alarm clock to see what time it was set to go off, and it was 5:30 o'clock. They made inquiries as to why he delayed so long in calling them. Defendant replied he might have been longer than he thought; that he fed the rabbit, and put the dog out, and might have fooled around longer than he thought he did. When the officers arrived, the little girl was in the front bed room asleep; at least she had her eyes closed. The officers related that Mr. Pruitt was asked which hospital they should take his wife to, and their evidence discloses that he said "I don't care where you take her." He was also asked the same question by the ambulance driver, and he was informed, "Well, she has been using Dr. Montague, and has used Dr. Hasselman. I don't care where you take her." He was also asked if he wanted to go with Mrs. Pruitt, and he replied he didn't want to go.

Then Officer Hendrickson testified that they picked up the gun with a pencil, through the trigger guard, and put it in his locker. Later he said he gave the gun to Chief of Police Holly. The gun was clean and free from dust or oil. Subsequent examination for finger prints, in the presence of Chief of Police Holly, by a Tulsa Police Laboratory expert, disclosed there were no finger prints on the gun. He testified he went back to the defendant's house, and on this occasion, asked the defendant where he kept his gun. The defendant said he hadn't had the gun in his hands for months; he didn't remember which end of the closet; he didn't remember whether it was in the other bed room closet, or whether it was in his closet. The officer then asked him where the ammunition was kept, and he told him to "come here and I will show you", and he reached in the closet to get it, and the officer said he exclaimed, "Whup, whup—wait a minute, don't touch it—let me get it." Whereupon, Officer Hendrickson related Pruitt reached in and grabbed it and started opening the box. The shells were obtained from the shelf in the closet, which closet was located just off of his bed room.

The officers stated that Mr. Pruitt said there was no one in the house the night before but the three members of the family. They further testified that there was no evidence of any windows or screens having been tampered with, and that almost every door in the house was shut. The defendant, he said, informed him that they were shut, because he didn't want the neighbors to hear. The defendant, he said, remarked "the Lord only knew they had heard enough as it was; they had heard aplenty, as it was." Officer Hendrickson said that wherever he went, the defendant went with him, and he was constantly talking to him, "telling me how mean she was." The officer testified that they arrived at the scene about 6:12 o'clock, A.M.; there was a rabbit on the back porch, and the dog was on the back porch.

Officer Hendrickson testified further that Mrs. Pruitt was an average size woman.

He further testified that the defendant informed them his wife had been under mental treatments by Dr. Montague; that he had been trying to get his wife to take mental treatments. He was asked on cross-examination if Mr. Pruitt told the ambulance driver to take her to the nearest hospital; he related that the defendant did not. Officer Hendrickson also testified that they found an ordinary claw hammer in the kitchen; he did not know where the hammer was, or whether it was ever examined to determine if there was blood on it. He admitted they found no instrument with blood on it at the home. However, he related the defendant informed them that his wife had been suffering for a considerable period of time from mental difficulties. The testimony of Officer Carter is substantially the same as that of Officer Hendrickson, though not so detailed.

James C. Cox, an embalmer, in Okmulgee, with the Buchanan Funeral Home, testified he went to the Pruitt home around 6:00 o'clock, A.M., and when he arrived, blood had run down Mrs. Pruitt's side, and had begun to congeal. He further testified that when they picked up the body, they folded the sheet, on which she was lying, over her head and the pillow, and picked her up and carried her to the preparation room at the Funeral Home. While they were cleaning up the body with water, there was a man's bloody sock which fell out of the sheet on to the pillow. He testified he first thought it was a clot of blood, but examination revealed it was a man's sock. He said that Mr. Pruitt agreed that Mrs. Pruitt should be taken to the Doctors' Hospital, because Dr. Hasselman lived right across the street. He asked Mr. Pruitt if he wanted to go to the hospital with his wife. He didn't remember what he said, but he did remember that he didn't go. He further testified the blood he saw congealed could have been shed about thirty minutes prior to his arrival.

At the Funeral Home, photographs of Mrs. Pruitt's head were made, and these were offered in evidence.

Numerous doctors testified on behalf of the State; the substance of this testimony, based on post-mortem, and the photographs, is as follows: They described two wounds; a semi-circular wound, allegedly made by a blunt instrument, and the bullet wound made by the .22 rifle. An effort by means of probing was made by the doctors conducting the post-mortem to find some connection between the two, but the State's doctors testified they were unable to find any connection between them. They testified, in substance, that the flesh between the wounds was solid, and in their opinions, the wounds were separate and distinct; that the semi-circular, or crescent-shaped wound was made by a blunt instrument by force applied from her right side, to her left side. They testified that after a bullet wound, such as was found, a person would be unable to inflict another wound by a blunt instrument, and that a blow on the head such as was present would probably produce unconsciousness, and hence obviate ability to commit suicide by shooting oneself. Two of them testified they removed the scalp to expose the skull; then they sawed the skull and removed it so as to expose the brain. They related there was a skull fracture marked by three intercepting lines. One of these fractures ran from over the top of the head, down across the forehead, into the orbit of the eye. It was their opinion this had been produced by a blow from a blunt instrument. They testified that they traced the path of the bullet through the brain by means of a probe; that they found the bullet at the junction of the brain and the spinal column. They related the bullet entered the left front portion of the skull; made a clean wound through it and struck the back of the skull and glanced down slightly. They testified further that the impact of the bullet might have caused fractures which radiated out from the bullet hole, but that the one down across the forehead into the orbit of the eye was made by a blow from a blunt instrument, and that it would take a considerable force to produce that kind of fracture. In addition thereto, they found a large blood clot under and along the right side of the skull, and stated that that kind of condition is produced by a blow. It was further testified that the brain was intact. Further-

more, this evidence disclosed either the blunt instrument blow, or the gunshot wound would cause death. Some of the State's doctors testified positively that the semi-circular wound at the right of the bullet hole was not produced by escaping gas from the gun explosion, since there was no tear in connection between the two head wounds. These doctors found there were powder burns within the bullet hole, but no powder burns around the semi-circular wound to the right of the bullet hole. It was the consensus of opinion among the State's doctors that the blow producing the long fracture into the right eye orbit would not necessarily break the skin or produce a depression in the skull. One of them testified that it was his opinion that the force of gas, as pictured by the defense, would destroy the brain, and that there was no destruction of the brain, except for the passage of the bullet through it, and that if the semi-circular wound was caused by the eruption of gasses in the bullet wound, as contended by the defendant, you could find the avenue of the gas by probing.

The foregoing is a substantial digest of the State's evidence, in chief. The defense assumed a bolder front in this trial than in the first trial, where defendant's testimony consisted of approximately only one page of testimony, which was a positive denial that he killed his wife. However, in the trial herein under consideration, again he denied that he killed his wife. He testified that for some time prior to Mrs. Pruitt's death, she became more nervous and unstable than she had ever been. He said that she took offense at suggestions about what she should do; particularly from people at the cafe. He testified that she was flowing constantly, and had a fear of cancer but that she would not go to a doctor. Finally, she did avail herself of the services of Dr. Montague, who performed a curettement. She got better for about thirty days, and again she started flowing. She cried a great deal, and when they talked together, her mind drifted into isolation from him, and then would drift back. He testified that sometimes Mrs. Pruitt gripped her hands until perspiration dripped from her forehead. She

smoked about three or four packs of cigarettes a day, and drank 15 or 20 cups of coffee. The defendant told the jury Mrs. Pruitt was jealous of him and accused him of having an affair with a woman at the hotel, and with all the women at the restaurant; then she would say she was sorry. He denied being unfaithful to her. He learned she had an appointment with a psychiatrist. He also said that he tried to get her to talk with her minister, but she would not do so. He testified he admonished his daughter to be kind to her mother.

In relation to her death, he testified that on the night of April 23rd, they closed the cafe, bought some ice cream, and went home. The door between her room and the living room was closed when he got up on the morning of the 24th. He said his wife was up that night when he went to sleep and he presumed she closed the door. During the night, he thought he heard a sound. The next morning he looked under the bed and there was a slat lying on the floor. He assumed the noise was from the slat falling out. He related he didn't know just when he got up on the morning his wife was shot; he didn't set the alarm, and he could only guess what time he got up. He denied the alarm clock was mentioned at any time when the officers were present. He related he got up and went directly to the bath room; took the little dog to the back door, and put him out. When he returned, he heard a gurgling sound. It was then that he saw his wife. He then went to the telephone and called the police. The officers came and he met them at the door and said, "right in here." Then they waited for the ambulance. He testified that before the ambulance came they had no conversation except they did ask him where he had the gun, and he told them in the clothes closet. Shortly thereafter, they asked him how she had been acting, and he told them. He said that the ambulance driver, Cox, asked him where to take Mrs. Pruitt, and he testified he said Dr. Montague was her doctor, but he was out of town, and he told them to take her to the nearest place that could give her a blood transfusion. Cox suggested she be taken to the Doctors'

Hospital because there was a doctor right across the street and she could get a doctor there in a matter of minutes, and he told Cox that was fine.

He denied the officer's statement he didn't care where they took her. He also denied that he ever fed the rabbit in his life. He said the officers asked him about Mrs. Pruitt's actions and he told them she was nervous, cried a lot, and was up at night a lot. He related that she read astrology and religious books. One book that she read was on Christian Morals. He said he told the officers the books were on the sewing table, by her bed, and that they could see for themselves. He enumerated a long list of tracts that she had been reading. There was also a Bible on the table. He denied that he ever told the officers he and his wife had hell that night. When asked if he shot his wife, he said, "I could never have done such a thing to any person." He said after the officers left, he sat in the living room in the big chair, with his daughter Virginia on his lap for quite a while. After a while he went to the cafe to care for the food which was in the process of preparation. He said he directed his employees to serve that, and then to close down. He testified his daughter cried before they went to the cafe because she said she had no clean under clothes, and "I told her we would get some." So when they went to town, they went to a number of places before they found her size. They bought her some under clothes and things. He didn't remember where they bought them, however.

Shortly after the officers left, he testified they called him and told him Mrs. Pruitt had died.

The undertaker came and asked him what to do with the body. He told him he could not say until he had contacted her family, but to go ahead and take care of the body. Shortly thereafter, he was arrested.

On cross-examination, he related that he and his wife had little differences, but never any violent arguments. From November to her death, her health was such he couldn't even talk with her or discuss anything with her and this got to be a daily occurrence towards the last. He further said that her crying got to be as frequent as when anyone would speak to her. He denied he had ever talked to his wife about a divorce, or about her going back to nursing. He admitted on cross-examination, however, that he wrote Mrs. Pursell, Mrs. Pruitt's sister, a letter on the typewriter. The letter was also signed on the typewriter. He said this was a little while before Mrs. Pruitt's death, he wrote this letter trying to explain the situation between himself and Mrs. Pruitt. This exhibit, he said, looked like the letter he had written. After reading it, he said he didn't think he could have possibly written this letter because he said that there were some things in it he didn't believe he put in the letter. He further testified on cross-examination, that he and his wife didn't sleep together after they came to Okmulgee, which was about 1950. He said that he and his daughter slept together.

On the morning of the 23rd of April, he said Mrs. Pruitt was not in the cafe until she came to dinner in the evening. He didn't talk to her very much that day, and that nothing unusual occurred, certainly indicating she contemplated suicide.

Virginia Ann Pruitt, the defendant's daughter, said that at the time of her mother's death, she was eight years of age. At the time of the trial herein involved, she was 11 years old. She testified her father and mother had not been fighting and fussing recently. She recounted how her mother had gone to Dr. Montague. She testified that her mother smoked cigarettes a lot; and cried quite often. She said that her mother acted nervous and her father told her not to excite her because he said she was mentally ill, and that she should humor her mother. She stated her father was nice to her mother; never cursing or striking her. She said the night before her mother's death, her father and mother were not quarreling. She testified that she and her father went to bed first, and admitted that they slept together. This began several years back when her mother was nursing, and would be out at night. She told the jury that she did not awaken until the next morning. She said that her

mother went to bed after she and her father had retired. She knew this, she said, because she heard her go to bed. She said that she fed the rabbit herself, but her Dad usually let the puppy out in the morning. She testified that she heard a noise in the night which she thought was a loose slat falling out of the bed. She did not awaken until the police came, after "her mother had been taken away." She recalled that her mother had an appointment with a doctor in Tulsa, which was made after her mother went to see Dr. Montague the last time.

She testified that she did not know where the gun was kept. She testified her father awoke each morning by an alarm clock. After her mother was taken away she said she and her father went to the cafe, had breakfast, and then they got her some new clothes for the funeral.

Pauline McGinty, an employee at the cafe from 1951 to 1952, testified that Mr. Pruitt was nice to Mrs. Pruitt, and that she had never heard them quarrel. Mrs. Pruitt said one day that Mr. Pruitt was going to have a preacher call on her, and Mrs. Pruitt told her that if he did he would get a good cussing. Mr. Pruitt, she said, came to the cafe the day of the killing, about 8:30 A.M., with Virginia, and stayed there for about an hour. When he left, he said, "If any of my folks come, send them out to my house." He said that he would be there.

Helen Payne, another employee, said she worked at the cafe a short time prior to April 23rd. That Mrs. Pruitt was nervous and forgetful; that she talked to Mrs. Pruitt shortly after she came from Dr. Montague's office, and Mrs. Pruitt told her that Dr. Montague had suggested she see a psychiatrist, and Mrs. Pruitt said she would not go to see one; that she would jump off the bridge before she would go.

Dr. E. M. Chedester, a veterinarian residing in Okmulgee, a customer and friend, testified that he noticed a very definite change in Mrs. Pruitt's appearance from the time he first met her. He said sometimes she was calm, and other times exceedingly nervous. About a week or ten days before her death, he said Mrs. Pruitt told him she believed she would go down and jump off the bridge. On cross-examination, he related that she began to come to see him about three months before her death. Mrs. Pruitt was jealous of the waitresses at the cafe, but he didn't find out why. Mrs. Pruitt told him she didn't know whether she should get a divorce or leave. On re-direct examination, he related he never heard the defendant abuse Mrs. Pruitt, but their conversation indicated some marital trouble. He discussed her condition with her husband, and advised him that she needed a psychiatrist and that the defendant told him he had been trying to get her to go but Mrs. Pruitt would not do so. He testified that she raised a disturbance with all the waitresses at the cafe, about Mr. Pruitt and them, and said that Mr. Pruitt would have to fire them. He said there was feuding between the waitresses and Mrs. Pruitt.

Thereafter, the defendant offered the testimony of Dr. Robert Lee Montague, who maintains a clinic in Okmulgee where Mrs. Pruitt was a patient of his. He testified that Mrs. Pruitt was about five feet, nine inches tall; that she came to him because of her nervous condition, and the irregularity of her menstrual flow. He treated her from December 27, 1951, until Monday before her death. During the time he treated her, he testified she became progressively more nervous and highly emotional. On Monday, April 22, when he last saw her, she was highly nervous and emotional, and in a state of instability. He said she asked him if she was crazy, and he told her no, but that she did need the help of a psychiatrist, and suggested to her Dr. Turner of the Springer Clinic, in Tulsa, and told her to call him. Shortly thereafter, she did call him and was greatly upset because she could not get an appointment for a week. As a registered nurse, she thought she should have an appointment immediately. He said Mrs. Pruitt's symptoms were those of any woman going through the change of life, but at no time did she indicate to him she was going to commit suicide. He further testified Mrs. Pruitt was tall and lanky and had long arms and legs.

The defendant called an array of pathologists, and doctors, among whom was Dr. Leo Lowbeer, who testified in the first trial of this case, for the State, to the effect that the bullet wound was made by the rifle, and the semi-circular laceration, or tear, was made by a blunt instrument. It was on the strength of his recantation and his apparent sincerity in his affidavit to the effect that upon consultation with some of the most eminent pathological authorities in the United States, and his affidavit in support thereof, that this case was reversed and remanded for a new trial. The testimony of other physicians, surgeons, and pathologists, was substantially the same as that given by Dr. Lowbeer, who performed a pathological examination in relation to Mrs. Pruitt's wounds, in which he made, in substance, the following findings:

This examination was made at Hillcrest Hospital, in Tulsa, Oklahoma, to which the body had been moved. His testimony was that the semi-circular tear could have been made by violence either from inside or outside, but he was not certain one could distinguish these two possibilities. He related that there was no connection in the skin under the bullet hole and the semi-circular tear to the right thereof. He testified further it was possible but not susceptible of proof that the tear could have been the result of gasses diffused through the deeper layers of the skin. He said this was possible without there being any obvious track. Moreover, he said it might have been caused by bone splinters. It was his conclusion that both of the wounds on the head might have been caused by the gun shot alone. He further testified that the fractures, as they appear in the photographic exhibits, were common gun shot wounds in the head and similar to those in a glass through which a stone is thrown. The fractures would radiate out from the hole. These fractures could have been so produced.

On cross-examination, he testified that he could find no obvious connection between the two wounds. He admitted that on his former testimony he testified the fractures were produced by a blunt instrument blow, but that now he had changed his mind. That although the fractures could either have been caused by a blunt instrument, or by a bullet, it was his conviction that they were more likely to have been produced by the bullet wound. Some of the defendant's doctors testified if the semi-circular wound had been caused by a blunt instrument, you would expect to find a depression in the skull. All of the doctors, including Dr. Howard Hopps, pathologist, testified there was no such depression in this case.

There were several witnesses who appeared on behalf of the defendant, among whom was Sheriff Holly, who testified to the good reputation of the defendant as a law abiding citizen.

The State offered Mrs. Reba Pursell, who identified the letter which she had received from the defendant, Robert Odell Pruitt, in California, about March, 1952. She said that her sister, Mrs. Pruitt, had written her every Friday for many years. When she received the letter from Pruitt, written on the typewriter, and signed on the typewriter, she attached so much importance to it that she sent it to her sister in Fresno, California, with a note attached thereto for her to keep it as it sounded important. Later, her sister brought the letter to Mrs. Pursell in Shasta, California, after the death of her sister, and she gave it to the County Attorney in Okmulgee. This letter is the one which Pruitt admitted first that he had written. Pertinent portion of this letter is as follows, to-wit:

"Reba and Austin:

"I picked up two of your letters and read them this morning where you keep asking Maurine about her condition. I hope that I don't cause you to start worrying about her for I have tried to do all that I can and now I admit that I can't keep from being mean and hateful to her.

"She walks aroung here in the Coffee Shop shaking her head from side to side, talking to her self, laugh out loud, caugh a lot, weigh about 135, smokes two or three packs of cirgaretts per day. Last night I was home

with Virginia and emptied an ash try, she went home one hour before we did and I counted Nine cigarett buts in that one tray in one hours time. She is so drunk that she cant do a thing. She cant remember things that she does or denies that she did them. She quit taking Thyroid medacine, drinks up to twenty cups of coffee per day.

"Maurine is so jealous of me and my work and authority that she just raves. I don't think that she cares for me but just that she has had her way all of her life and if she cant run the whole show she is trantic. This is not just an opinion but she cried for months every night and one night she told me that she was just plain jealous because I had made a go of this business.

"I am told each day that she is going to leave me soon, ask me if I will sigh divorce papers, tells me to go get me a girl some place not to touch her, not even put my hand on her. This one thing that is becoming tiresome to me. I am not allowed to evon put my hand on hers or come near her. She tells me that I am in my second child hood and just want a bunch of young girls around me. So help me I have not had one thing to do with any girl except to work them and she admits that but never stops griping and digging me about it.

"I talked to the Doctors here and in Tulsa and none of them give me any information except to tell me that she just has to get hold of her self. If she goes on it will be only a matter of time until she is in some institution. If she does leave and as it is now I dont think that we can go on, she will get someplace and get down with Virginia to take care of and no one to do a thing for her. As it is she tries to lay all the blame on me, tells me that she just hates me, cusses me every day, grits her teets at me and Virginia every time we do the least thing, cries, reads the bible an hour or more every day, all kinds of

books from the library on your mind, clips every thind out of the paper about physiology, controlling the mind, Etc. yet tells me that it is only me that is bothering her.

"I tried to tell her that we should never have a child for I had enough trouble with her the first few years we were married but she kept persuading untill she got pregnant. Now she knows that I love Virginia and do all I can for her under the conditions in which Maurine forces me to live. Everyday she uses Virginia as a threat to gain ground on me. I never go to a party, hunt, fish, go any place alone, just work and try to keep up with her expenses. She just laughs and tells so what if she is expensive what am I going to do about it.

"I am not down in the dumps and just trying to get someting off of my chest but just trying to tell you what you have been asking her to tell you. I cant do a thing with her. I have tried to tell her that if she wants to leave why run her self down and abuse her self go and leave while she can still walk.

"If you can suggest anything that for me to do I will do it if possible. Maby it is all me, if it is a just cant make her a living and keep a bunch of old bags here so old they cant work and still have time to baby her day and night. I work hard here, cook some, buy everything, work out front, keep all the books et. She doesn't keep house it looks like L——, all time, has the washing and Ironing done, and is up here only three or four hours per day.

"Please don't write to he and tell her that I have written anything at all. You could tell her that you wrote to the Doctor, she would never ask him, that your mother told you how she looked or something like that but I wish someone could put some scare into her for her good at least. It is a pity for some one to become so warped and unreasonable. She is your sister and you perhaps have always

thought that it was my fault the way we got along, perhaps it is, maybe I am crazzy as can be, but if I am I have fooled a lot of responsable people. * * *

"* * * I lived two blocks from my sister for two years and was in her house one time. I never ate a meal at home but what I ate it listening to Maurine gripe about my parents. I stayed away from them unless she took me. I have always told her that I cound not help what they were and what they did and that all I could do was to live my own life.

"Tell Him and Bud hello when you see them, and don't take this thing serious for what ever comes will just come. I have consoled myself to the fact that I have to give up Virginia. It will be the largest blow that I will ever come into my life and I am sure of that.

"/typewritten/ Odelle."

On the strength of this testimony, the jury returned its verdict that the defendant was guilty.

■ Whether we believe the doctors for the State, that the gunshot was preceded by a blunt instrument blow, or believe the defense theory, is not for our determination, but was settled by the jury. It found the deceased met her death by the means charged in the information. However, the evidence on either theory supports the verdict. The fact the proof of the means of death is all circumstantial presents no obstacle to sustaining the conviction.

■ It has been held by this court that, where there is evidence, although entirely circumstantial, from which the jury may reasonably and logically find the defendant guilty, the weight, credibility, and probative effect of such evidence is for the jury, and this court will not disturb its verdict for insufficiency. Rucker v. State, 64 Okl.Cr. 259, 79 P.2d 629, 630:

"Where there is evidence, although entirely circumstantial, from which the jury may reasonably and logically find a defendant guilty, the weight, credibility, and probative effect of such evidence is for the jury, and this court will not disturb its verdict for insufficiency."

In the body of the opinion, the late Judge Doyle further said, 64 Okl.Cr. at page 263, 79 P.2d at page 631:

"We think a verdict of a jury based upon circumstantial evidence comes to us as any other verdict, and unless we can say that the inference of guilt drawn from the evidence is wholly unwarranted, we cannot interfere."

Williams v. State, 97 Okl.Cr. 229, 263 P.2d 527. See also Morris v. State, 67 Okl.Cr. 404, 94 P.2d 842, 845. This is another opinion by Judge Doyle in which the foregoing rule was announced, and wherein he further said:

"We regard the circumstances established against the defendant amply sufficient to sustain the verdict. Where a conviction rests upon circumstantial evidence, and circumstances are proven from which the reasonable and logical inference of guilt clearly arises, and which exclude any reasonable hypothesis except the guilt of the accused, although the evidence is conflicting this court will not disturb the verdict for insufficiency of the evidence. Halbert v. State, 35 Okl.Cr. 329, 250 P. 436.

"A question merely of fact is presented by the evidence, dependent wholly upon the credibility of the witnesses and the weight of their evidence. There could be no case suggested presenting a matter more proper for the decision of a jury. The jurors are the sole judges of the credibility of the witnesses who testified before them; and they are not bound to, nor can they be compelled to, credit the testimony of any witness, whether contradicted or not.

"In the opinion of this court, there was sufficient evidence to warrant the jury in returning a verdict of guilty, and, the jury being the tribunal upon which by our Constitution and laws is especially imposed the duty of weighing the testimony, and having so

weighed the testimony and found against the defendant, it is not the province of this court to disturb their verdict."

Such is the situation here presented.

The foregoing evidence, though entirely circumstantial, presents some very damaging evidence against the defendant. At the outset he tried to leave the impression with the jury that his association with his wife was no more turbulent than that of an ordinary married couple. Subsequently, he was compelled to admit this was not so. It certainly was contrary to the information conveyed to Mrs. Pursell, Mrs. Pruitt's sister, in the typewritten letter of March 22, 1952, which the defendant first admitted he had written. The sentiments expressed therein are corroborative of those the officers said he conveyed to them, when they arrived at the house. No doubt they had been having "hell" as he told the officers, and as he virtually said in his letter to Mrs. Pursell. If he hadn't been mean to his wife, there would have been no purpose in so admitting that he had, to Mrs. Pursell. Moreover, the defendant's attitude after her death is a circumstance bearing greatly against him. We are of the opinion the officers didn't manufacture the statements he allegedly made. The letter to Mrs. Pursell corroborates them. Furthermore, his conduct in not accompanying his wife to the hospital confirms what the officers said he told them. His demeanor was cold and heartless, and certainly not that of a normal husband. At no time after the shooting did he manifest a normal interest, as evidenced by his delay in calling for help. The fact that he called the police instead of a Doctor and ambulance is most unordinary. The lack of finger prints on the gun, and the finding of a man's sock in the blood in the preparation room at the Funeral Home, appears as the device by which the prints may have been removed by the killer. No one would be so presumptuous as to believe that Mrs. Pruitt could have removed the finger prints from the gun after the infliction of what some of the doctors described as the blunt instrument wound, or after the gun shot wound. The admitted fact that no one was

there but the family that night leaves only the possibility that the wound was inflicted by the defendant, or by Mrs. Pruitt herself. The very nature of the two wounds, as described by the doctors, on either the theory of the State, or the defense, excluded the possibility of Mrs. Pruitt having taken her own life.

Ordinarily, this court does not require the production of the instrument of death, but in this case, we did. The gun measures 30 inches from the muzzle to the trigger. We have experimented with the gun in an attempt to ascertain how Mrs. Pruitt could have shot herself with the gun. While it may have been possible for her to have shot herself with the rifle, we are of the opinion, in light of all the circumstances, including the position of the body on the bed, the path of the bullet through her head, and the distance from the muzzle to the trigger, that Mrs. Pruitt could not have shot herself in the manner in which she was shot. Furthermore, the defendant's haste to beat the officers to the box of shells may have been to prevent them from finding some evidence indicating guilt. Although the medical evidence is in conflict, as to whether Mrs. Pruitt's death was the result of two wounds, no doctor attempted to say Mrs. Pruitt could have inflicted the wound caused by the rifle bullet. These were all questions for the jury, which it resolved against the defendant.

■ The defendant's next contention is that the court erred in denying their application for a change of venue. This matter was presented on affidavits and oral testimony. After twelve jurors had been selected, and qualified, both the County Attorney, and defense attorney, waived all their peremptory challenges. Under these conditions we cannot say that the trial court abused its discretion. Moreover, we are of the opinion that if this point had any merit, it was waived by the conduct of counsel, in accepting the jury without exercising so much as one peremptory challenge.

■ The defendant further contends that the court erred in denying defendant's motion to require the State to elect whether the cause of death was by striking,

hitting, and beating deceased, on the forehead with a blunt instrument, or by shooting the deceased with a .22 caliber rifle in the forehead, both of such allegations were made in the information, conjunctively. In Bruster v. State, 40 Okl.Cr. 25, 266 P. 486, it has been held that:

"Where an offense may be committed by the use of different means, the means may be charged in the alternative in the same count. Where an information charging murder alleges that the homicide was committed by shooting with a pistol and by striking with an ax, the information is not duplicitous, and the state is not required to elect upon which of the means charged it will rely, and proof of either or both will sustain the allegation as to the means used."

■ The defendant next urges that the court erred in admitting incompetent evidence on behalf of the State. This contention was directed to the testimony of Sheriff Ellis Holly, who qualified as an expert at removing finger prints, but did not pose as an expert for classifying the same. His testimony was to the effect that he took the gun involved herein to the Tulsa Police Laboratory, where he saw it dusted for finger prints, and related that no finger prints appeared on the gun. The admissibility of this evidence, and the expertness of Officer Holly to testify in relation to the same, was within the trial court's discretion. It has been held that, "In determining whether or not the conclusions or opinions of either an ordinary or an expert witness are admissible, the court may exercise a large measure of discretion. The court may exercise discretion in determining whether a sufficient foundation has been laid to permit a witness to state a conclusion or in determining whether a witness is qualified as an expert." 23 C.J.S., Criminal Law, § 858, sub-sec. d, p. 70. In Holt v. State, 84 Okl.Cr. 283, at page 296, 181 P.2d 573, at page 580, this court said:

"The general rule is that the question of competency of a witness to testify as an expert is largely a matter of discretion for the trial court and it

requires clear proof of error to warrant a reversal by the appellate court on such matters. 54 A.L.R. 863."

We cannot say that under the record herewith presented, that the trial court abused its discretion in permitting Sheriff Ellis Holly to testify to the fact that he saw the gun tested for finger prints, and that there were no finger prints thereon. We are of the opinion that his qualification as an expert is a matter of the trial court's discretion, and we cannot say that he abused his discretion.

■ Further the defendant asserts the trial court committed error in receiving the verdict in the form in which it was returned. The verdict was in the usual form, setting the sentence at life imprisonment, with "a recommendation from this jury for a parole, when eligible." When the jury returned the verdict they were informed by the court of the fact that the recommendation was in no way binding upon the pardon and parole officials, and that they had no power to control that situation. They were asked if each of them understood that, and they said that they did. Notwithstanding that they were so informed, upon being polled by the court, each juror answered that the verdict of guilty and the sentence imposed, was their verdict. There can be no question in this case but what the intent and purpose of the jury was clearly expressed in the verdict, as reflected by the polling of the jury. They found the defendant guilty, as charged in the information. The jury's recommendation for leniency, or parole, when eligible, was not prejudicial to the defendant's rights, but as a matter of fact, may yet prove to be beneficial to him. It has been held that "The inclusion in the verdict of the jury of a recommendation of leniency is not binding on the trial court * * *." Logan v. State, Okl.Cr., 269 P.2d 380, 381. Certainly such a recommendation would not be binding upon the Pardon and Parole Board, but as said in Logan v. State, supra, though such a recommendation may be improper, since it is beneficial to the defendant, it does not constitute prejudicial error. See also Holman v. State, 97 Okl.Cr. 279, 262 P.2d 456. In Turvey v. State, 95 Okl.

Cr. 418, 247 P.2d 304, the latter two cases were cases involving recommendations for suspended sentences, and with recommendations to the trial court, but the principal involved is the same as that herein in question.

■ The final proposition raised by the defendant relates to the letter written to Mrs. Pursell by the defendant, on the typewriter, dated March 22, 1952. The record discloses that the defendant admitted writing the letter and that he had never written but one letter to his sister-in-law, and he sufficiently identified it before his retraction, and we are of the opinion that the same is clearly admissible. The letter was permitted by the trial court to go to the jury, only for the purpose of rebutting the testimony theretofore offered by the defendant as to the marital relationship between the defendant and his wife, being disturbed only by the ordinary differences which occur between husband and wife, and was further limited to such bearing as it might have on the weight and credibility to be given to that testimony. The jury was further advised it was up to them to determine what weight and credit to be given to the letter, as it may affect the testimony of the witnesses relative to their marital relationships. Under these circumstances, being so limited, the letter was entirely competent.

The defendant cites no authority in support of this contention, and we presume he failed to do so only because he could find none in support of it.

The judgment is affirmed.

JONES, P. J., and POWELL, J., concur.

JONES, Presiding Judge (concurring).

Upon the first consideration of this case I had grave doubts as to the guilt of the accused, principally because of the divergent opinions expressed by eminent doctors and pathologists concerning the nature of the wound or wounds which were inflicted on the deceased and the absence of what I thought was substantial evidence indicating a motive for the crime. It was to satisfy my own doubt about the case that the reporter was directed to send to the Clerk of our court the rifle which was introduced in evidence and admittedly used to fire the bullet which took the life of Mrs. Pruitt. The death gun was a bolt action repeating rifle with an apparently longer barrel than is ordinarily found on a .22 rifle. After seeing the gun, I became convinced that it was a physical impossibility for Mrs. Pruitt to have shot herself in the manner in which she was shot. Being thus satisfied that the wound was not self-inflicted, I can see where the jury could arrive at no other conclusion than that of the guilt of the accused.