Nathaniel SMITH, Jr., Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–17947.

Court of Criminal Appeals of Oklahoma.

May 8, 1973.

Rehearing Denied May 30, 1973.

Jack N. Shears, Ponca City, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

Appellant, Nathaniel Smith, Jr., hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Kay County, Oklahoma, for the offense of Larceny of Domestic Animals. His punishment was fixed at three (3) years imprisonment in the State Penitentiary. A motion for new trial was duly presented and overruled; and judgment and sentence was imposed on May 27, 1970. Notice of intent to appeal was appropriately filed, although no direct appeal therefrom was taken. Thereafter, defendant filed an Application for Post-Conviction Relief in the District Court of Kay County on June 12, 1972. A hearing was held pursuant to defendant's application at which time the trial court entered a judgment ordering that defendant was entitled to an appeal out of time. Pursuant to the order of the District Court defendant has timely perfected his appeal to this Court.

Briefly stated, the evidence established that on the morning of January 23, 1970, Eddie Hembree, owner of a cattle farm adjoining the Kreger farm, discovered a dead heifer and a dead steer on the Kreger property and notified Ken Kreger, a co-

owner of the farm. Hembree then identified pictures of the scene as true and correct representations of what he observed on the morning in question.

Glen Kreger testified that he was an owner of the Kreger property, and that cattle were on his land on January 22 and January 23, 1970. He also identified pictures of the scene and stated that the cattle found where a heifer and a steer belonging to himself and his son, Ken. Mr. Kreger testified further that he did not know defendant, nor had he seen him before the date of the trial.

Joe Kreger then testified that he is the son of Glen Kreger and that he had been in the pasture the previous evening, January 22, 1970, and that the two animals were alive and apparently in good health. He further testified that he did not know defendant, nor had he seen him before and that permission to butcher or kill cattle had been given to no one.

Otis Johnson, a local butcher, testified that he was hired by Mr. Kreger to butcher and salvage the remaining portion of the two dead cows. Mr. Johnson testified that he removed a bullet from the head of each animal and that in his opinion the projectiles were .22 caliber shorts and that they caused the animals' deaths. Johnson also testified that the animals were partially skinned, and the hindquarters were removed.

Thomas Johnstone, a Kay County deputy sheriff, testified that he and another deputy commenced an investigation concerning the dead cattle. In connection with the investigation defendant was questioned on the evening of January 23, 1970, at defendant's home. Defendant denied the act and claimed no knowledge of the slaughter. The deputy again questioned defendant during the late hours of February 17, 1970, and the early hours of February 18, 1970, at defendant's home and placed defendant under arrest for larceny of domestic animals arising from the slaughter of the Kreger cattle. Defendant was advised of his rights and again denied the act. He stated that any meat found in his home would be wrapped and packaged in regular grocery wrapping reflecting purchase from a retail grocery store. Thereafter, defendant advised the deputy and Kay County Sheriff Coffelt that they had his permission to search his home and station wagon. A large jar containing "rough cut chunks" of cooked beef and a large cut of meat wrapped in a Wonder Bread wrapper were taken from defendant's refrigerator and freezer during the search. The items were subsequently admitted into evidence. A knife with bloodstains thereon, a large cloth spotted with blood and taken from defendant's station wagon, and hair and blood samples taken from the floorboard of defendant's vehicle were also taken during the search, identified by the deputy and admitted into evidence.

During cross-examination the deputy stated that material obtained from a fence post at the scene of the crime had not matched any of defendant's clothing. However, the material did match clothing belonging to one Jerry Burns. Twenty-two shells and rifles were found in defendant's home, but no ballistics tests were made on said shells. A box of bones was found on the premises, but the deputy could not state that the bones were of beef origin. The deputy further testified that the investigation into the activities of defendant revealed that he was a hunter and trapper of coyotes, beaver and muskrat, and the pelts and carcasses obtained by defendant were often placed and stored in defendant's automobile.

On redirect examination the deputy testified that defendant had stated that he had been rabbit hunting with .22 rifles with one Jerry Burns and another gentleman during the day and with Jerry Burns during the evening of January 22, 1970. The statements of defendant were that they hunted until midnight and used his station wagon. The deputy stated that defendant denied shooting the cattle, but stated, however, "that he knew who had."

Mr. Jim Beiter, chief investigator for the Oklahoma Cattlemen's Association,

stated that he had been around and worked with cattle all his life and that in his opinion the large cut of meat found in defendant's freezer was a "round which is a portion of the hindquarter of animals." He further testified that the hair obtained from defendant's automobile was, in his opinion, from a "Hereford animal." During cross-examination Mr. Beiter could not state, however, that the hair came from a heifer.

Mr. Donald Flynt, chemist for the Oklahoma State Bureau of· Investigation, stated that an analysis of the knife revealed that there was blood on it, but that he could not determine its origin. He did determine, however, that the cloth taken from defendant's vehicle contained blood stains of beef origin. The hair and blood samples taken from the vehicle were analyzed, and it was positively determined that the blood was of beef origin. Mr. Flynt could not identify the hair. On cross-examination Mr. Flynt stated that he could not identify the samples of blood as being from any specific animal.

At the conclusion of the state's evidence defendant demurred to the evidence and moved for a verdict of acquittal in favor of defendant on the ground that the state failed to establish a prima facie case of larceny of a domestic animal against defendant:

The trial court overruled the demurrer and the motion and allowed defendant an exception as to each.

Defendant then proceeded with his evidence in chief and took the witness stand in his own defense. He testified that he, Jerry Burns, and Bill Pedigo had been rabbit hunting in the afternoon before the night of the slaughter of the cattle, and that he and Burns had separated from Pedigo about an hour before darkness, and the two then stopped for some beer, later ran some traps, and drove around some and he then drove Burns to the home of Raymond H. Burns, father of Jerry Burns, and let him out. Defendant then left for his own home in Ponca City about midnight.

He positively testified that he did not shoot any cattle and as a matter of fact he was not certain he even knew where the Kreger farm was located. He continued with his testimony by saying the large piece of beef found in his refrigerator had been purchased by him at the Safeway store or Miller's store.

On cross-examination defendant answered that previously he had been convicted of Robbery in the First Degree in the state of Kansas. He again testified he did not shoot the cattle and when asked if Jerry Burns had shot them he answered, "Well, I don't know." He stated he and Burns had been together that evening and that he took Burns back to his father's house. He was asked if he saw Burns' father that night and he said he had, there at the father's house. The following questions were then asked, continuing the cross-examination, and defendant gave these answers:

"Q. Anybody have any meat at that time?

"A. What kind of meat?

"Q. Any kind?

"A. Yes.

"Q. What kind of meat did you have when you saw Mr. Raymond Burns?

"A. What kind of meat I have?

"Q. Yes.

"A. We had a rabbit or two I guess.

"Q. Have anything larger than a rabbit or not?

"A. Well, I don't know whether we have any larger than a coon or not. We might have had a coon.

"Q. Did you have any hindquarters of beef?

"A. No.

"Q. Did you have any beef at all?

"A. No."

\* \* \* \* \* \*

"Q. Did you have any beef with you when you went to the Raymond Burns' home in Tonkawa on that night?

"A. No.

"Q. Did Mr. Burns tell you that you couldn't leave that meat or bring that meat into his home?

"A. He never said anything about no meat. There wasn't any.

"Q. Was there some meat laying on the fender of an automobile, some butchered beef meat?

"A. Not that I know anything about.

"Q. The time that you were at Raymond Burns' home?

"A. No."

\* \* \* \* \* \*

Upon completion of his own testimony, the defendant rested, and the State then called Raymond H. Burns, father of Jerry Burns, in rebuttal, who testified on the evening in question, about 6:00 p. m. his son, Jerry Burns, and the defendant came to his home and brought with them some rabbit which they cooked and ate and following which defendant and Jerry Burns left his home about 8:00 p. m. and again returned about midnight. In response to the following questions he gave these answers:

"Q. How long were they gone?

"A. Until around midnight.

"Q. Did you see them after that?

"A. Yeah, they come in and drank some coffee.

"Q. About what time was that?

"A. Around midnight I said.

"Q. I see. Were they together at that time?

"A. Yeah, they was together at midnight.

"Q. Jerry and Nathaniel (defendant)?

"A. Yeah.

"Q. Was anybody else with them when they came back?

"A. No.

"Q. How did they come back or how did they get back to your place?

"A. Well, I guess they drove the car up there.

"Q. Was the car with them when they got back—that station wagon?

"A. Yeah. It was parked out there."

\* \* \* \* \* \*

"Q. Did they have anything with them that they had not had earlier in the evening?

"A. Jerry had something he didn't need.

"Q. What?

"A. Smitty didn't.

"Q. What was that?

"A. I say Jerry's the only one.

"Q. What did Jerry have when he got back there about midnight?

"A. He brought a piece of meat in there.

"Q. How would you describe that piece of meat?

"A. Just a chunk of beef is all I could say. Quarter or something, that's all I'd say.

"Q. What part of a beef would you say that it was?

"A. A hindquarter I'd say that Jerry had.

"Q. What was Jerry doing with this hindquarter when you first saw him?

"A. He was carrying it in his arms.

"Q. Where was he coming from with it?

"A. Coming down between his car and my car. I didn't see where he come out with it. Jerry could have carried it from anywhere.

"Q. I see. Were they coming from the direction of the station wagon?

"A. Well, they had to come that way. It was fenced in all the rest of the way.

"Q. I see. Where was he taking it?

"A. He was coming to my back door, Jerry was.

"Q. Where was Smitty (defendant) at the time?

"A. He was behind. Walking behind Jerry."

\* \* \* \* \* \*

"Q. Show us about how large it was with your arms.

"A. (Indicating) About that long I'd say. You know, a hindquarter.

"Q. How was he carrying it?

"A. Jerry had it there in his arms. I don't know where he got it or I didn't ask him where he got it.

"Q. Was it wrapped up?

"A. No, it wasn't wrapped up."

\* \* \* \* \* \*

"Q. How was he carrying it, how was Jerry carrying the meat?

"A. Carrying it in his arms.

"Q. Both arms like that?

"A. Yeah, that's the way he had it when he got there in the door. I wouldn't let him bring it in.

"Q. You wouldn't let him bring it in your house?

"A. No, I didn't want it in my house."

For his appeal defendant asserts ten specifications of error and in his brief he groups them into five separate and distinct Propositions, which we shall consider in their numerical order.

Proposition I: EVIDENCE WAS INTRODUCED WHICH WAS INCOMPETENT, IRRELEVANT, IMMATERIAL AND PREJUDICIAL TO DEFENDANT.

In this proposition defendant asserts error by the trial court permitting one Jim Beiter representative of the Oklahoma Cattlemen's Association, to express in his testimony his opinion that the origin of State's Exhibit No. 8, a sample of hair taken from defendant's station wagon, was hair from a Hereford animal. The witness qualified himself before expressing his opinion that he had worked with cattle all his life and had experience with Hereford cattle.

 We do not find that the trial court was in error in admitting this testimony. In Pruitt v. State, Okl.Cr., 290 P. 2d 424, this Court held:

"'The general rule is that the question of competency of a witness to testify as an expert is largely a matter of discretion for the trial court and it requires clear proof of error to warrant a reversal by the appellate court on such matters.'"

Such required clear proof is not in the record. There is no error in this regard.

Proposition II: THE COURT ERRED IN OVERRULING THE DEFENDANT'S DEMURRER TO THE EVIDENCE AND MOTION FOR DIRECTED VERDICT.

At the conclusion of the State's case in chief the defendant demurred to evidence, which was overruled and exceptions were allowed; then he moved for a directed verdict of acquittal, which was overruled and exceptions allowed.

The State's evidence in chief is highly circumstantial and the defendant is warranted in urging that such evidence did not establish or make out a "prima facie case." For the sake of his theory on this Proposition, let us assume that the State's evidence in chief was insufficient, but the record reflects that following the adverse ruling the defendant took the witness stand in his own defense and testified, in part, as above quoted. The answers given in cross-examination, and particularly his denial of having had anything to do with any beef the night in question, justified the State in calling the father of Jerry Burns, Raymond H. Burns, as a State's rebuttal witness, and his testimony, part of which is shown above, positively identifies Jerry Burns and the defendant with a hindquarter of beef at midnight of the very night of the slaughter of the cattle.

 From all the evidence in the case, the jury was warranted in determining the defendant guilty as charged in the Information.

Defendant cites and quotes in support of his Proposition, Scales v. State, Okl.Cr., 270 P.2d 378 as follows:

"Where defendant's demurrer to state's evidence should have been sustained because of failure of state to make out prima facie case, evidence following the demurrer could have no bearing on question of sufficiency of state's evidence in first instance."

This case is in conflict with those of other jurisdictions, including, but by no means limited to, the following:

"* * * By introducing evidence in his own behalf, defendant takes the risk of completing a case against himself." United States v. Kenny, 236 F.2d 128.

"* * * The law is settled that when the defense proceeds, an objection to the denial of a motion for a directed verdict is waived and the action of the trial court will not be considered on appeal except where there is manifest error and it is necessary to prevent a miscarriage of justice." Johns v. United States, 227 F.2d 374.

"* * * Defendant elected not to stand on his motion and presented evidence in his defense. In such a case the denial of the motion may still be assigned as error but we must consider all of the evidence and affirm the trial court if the record as a whole contains sufficient evidence to support a verdict against the defendant." State v. Nix, Or.App., 491 P.2d 635.

"Defendant challenges the constitutionality of the rule that a defendant waives his right to assign error to the trial court's denial of a motion to dismiss at the close of the state's case when he subsequently presents evidence in his own behalf. * * * 'This may sometimes present the defendant with a hard choice, but that is true in many situations which may confront litigants in the course of almost every trial, and provides no basis for exempting the defend-ant from the provisions of the rule * * *' * * * If defendant believes his motion is well taken, he should stand upon it." State v. Portrey, 6 Wash.App. 380, 492 P.2d 1050.

For other cases see: State v. Howe, 69 Ariz. 199, 211 P.2d 467; State v. Stockton, 6 Utah 2d 212, 310 P.2d 398; Tucker v. People, 136 Colo. 581, 319 P.2d 983.

■ We hereby expressly overrule Scales, supra, and other cases of this Court, if any, in so far as they conflict with the views herein expressed in reference to defendant's Proposition II, supra and state that henceforth the rule in this state is that "a defendant by offering evidence after a denial of a motion for acquittal waives that motion and thereafter the question of the sufficiency of the evidence to sustain a conviction is to be determined by an examination of the entire record."

Proposition III: THE COURT ERRED IN GIVING CERTAIN INSTRUCTIONS OVER OBJECTION OF DEFENDANT.

A close review of the transcript and careful consideration of the Court's Instructions, reflect that the court properly and adequately instructed the jury on all issues created by the evidence, and no error exists in reference thereto.

■ The record reflects defense counsel dictated into the record, "Comes now the defendant and objects to Instructions 3 through 11," but failed to submit in writing requested Instructions. Such record will not adequately protect asserted error in the Instruction. See Sheehan v. State, 83 Okl.Cr. 41, 172 P.2d 809.

Proposition IV: THE COURT ERRED IN CONDUCTING PROCEEDINGS WITHOUT DEFENDANT'S ATTORNEY BEING PRESENT.

The record reveals that after deliberating for some time the jury, having been re-

turned into the open courtroom at their request, made general inquiry of the court as to the effect of a hung jury and requested to hear the testimony of the defendant and the Witness Raymond Burns "played back" and the court permitted this to be done by the court reporter. Throughout this proceeding, the record reflects State's counsel was present, the defendant was present but defense counsel was not, "having gone to Ponca City." His absence is otherwise unexplained and he must bear the burden for it.

Title 22 O.S.1971, § 894, provides:

"After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the county attorney and the defendant or his counsel, or after they have been called."

Defendant cites Badgwell v. State, Okl.Cr., 418 P.2d 114, in support of his contention that such proceedings were contrary to said statute, but a reading of the case reflects an exchange of written notes between the court and the jury without the knowledge of the State's counsel, defense counsel, or the defendant. Plainly it violates the statute but it is not applicable to the facts in the instant case.

 We fail to find that defense counsel's absence resulted in any prejudice to a fair trial.. The defendant asserts under this same Proposition that during the courtroom proceedings recited above, the court made improper and coercive remarks to the jury as to the effect of a hung jury, expense, time, and so on. We do not find this to be the proper interpretation of the court's remarks and we find no error in this regard and we do not find that the court's remarks come within defendant's cited case of Spomer v. State, Okl.Cr., 395 P.2d 657.

Proposition V: IT WAS ERROR TO PLAY A TAPE RECORDING OF THE TESTIMONY OF CERTAIN WITNESSES AFTER JURY MADE REQUEST TO HEAR CERTAIN TESTIMONY AGAIN.

This final Proposition has to do with the playing of the tape of the recorded testimony of defendant and Witness Raymond Burns as mentioned above.

 The trial court did not abuse its discretion in granting the request of the jury in this regard. The playback of the tapes came within a fair, reasonable interpretation of 22 O.S.1971, § 894, *supra.*

In conclusion, we observe that the entire record is free of any error which should disturb the judgment and sentence pronounced by the trial court in this case. It is affirmed.

BRETT, J., dissents.

BUSSEY, J., concurs.