## JACK MORRIS v. STATE.

No. A-9472.   Oct. 6, 1939.
(94 P. 2d 842.)

Joe S. Eaton and James K. Eaton, both of Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, P. J. This appeal is from a judgment of conviction rendered on a verdict of a jury finding Jack Morris guilty of the crime of larceny of domestic animals, and fixing his punishment at two years' imprisonment in the state penitentiary.

The information charges that Jack Morris, in Okmulgee county on or about the 23rd day of July, 1937, "did, unlawfully, willfully and feloniously, by fraud and stealth take, steal, and carry away two cows, ages about three and six years, the personal property of George Wittman, without his consent and against his will, and with the felonious intent to convert the said personal property to his own use and to permanently deprive the said owner thereof."

Neither in the petition nor the brief is any complaint made of the instructions or of any ruling of the trial court in the admission or rejection of testimony. The sole ground urged for reversal of the judgment is that the verdict is not supported nor sustained by the evidence.

The evidence shows that on the date alleged George Wittman lived on a farm 15 miles west of Okmulgee, and kept his cattle, some on the farm and 46 head in a pasture five or six miles southwest of the city of Okmulgee.

Marion Thornburg was employed to take care and look after the cattle in the pasture. Thursday evening July 22, 1937, all the cattle were in the pasture; the next morning he found two of the cows missing, one a black motley faced cow, branded "W" on the left hip, the other a little red spotted, three year old, branded "W," with short horns, and with an ear tag.

George Wittman testified that he had raised the two missing cows, that he went to the pasture, made an investigation and found where the cows had been driven from the pasture and loaded into a truck; that he learned that on the night before the cattle were missed an automobile with a two-wheel trailer had been seen by persons residing in the vicinity, and that there was a cow or cattle in the trailer; that he learned that defendant had conveyed two cows from his home near Preston to Tulsa on said 23rd day of July; that these cows were hauled in a trailer attached to a car driven by defendant; that he went to Tulsa and visited the stockyards and learned that said defendant had delivered two cows at the stockyards on July 23rd. The commission man who received the cows said he sold the same for defendant.

Frank Mitchell testified that he lived six miles west and six miles south of Okmulgee; on July 23rd he was at home, and was at Honey Creek Store that evening when he noticed a car with trailer going west. In describing the trailer he said: "A trailer like that is kind of out of the ordinary since pick-ups came into use. It was a two-wheeler trailer with a sort of stock bed on it." He could not tell who the man was that was driving, because his back was to him.

Earl Baker testified that he lived about a mile west of Wittman's pasture; that he had been at a neighbor's house and was returning home about 2 o'clock in the morning, driving south and east, and noticed a car with a two-wheel trailer east of the Salt Creek Bridge, going

west from the George Wittman's pasture. The trailer had some cattle in it; the one next to him was a spotted cow.

Mrs. Earl Baker testified that on the 23rd day of July, between 2 and 3 o'clock in the morning, she noticed a car and trailer with a cow or some animal with spots on it; that the car was going north towards the Rocky Hill School.

D. Brooks testified that he lived a half a mile west and a mile and a half south of Rocky Hill School; on July 23rd he was awake during the night and about 20 minutes to 3 he saw a car and trailer pass; it was a bright moonlight night, and he noticed it was a two-wheel trailer, unpainted, and he saw a white faced cow; she had her head up.

Servilla Brooks, the wife of D. Brooks, testified that she was at home and noticed a car and a two-wheel unpainted trailer going by, and she decided to go to see if her cows were still in the pen; when she came back she looked at the clock and it was 3 o'clock; the trailer had a white faced cow in it.

James McFarland testified that he lived at Preston; that defendant Jack Morris lived a half a mile south of him; that he is familiar with the car that Jack Morris drives; had seen him pulling a two-wheel trailer and a four-wheel trailer; he was at home Friday night, July 23, and was awake about 4 o'clock; a car stopped in front of his house; he pushed the blind back and looked out and it was Jack Morris' car, pulling a trailer with two head of cattle in it; the car went south towards Jack Morris' place.

John Lenox, sheriff of Okmulgee county, testified that he was acquainted with Jack Morris and had occasion to go to his home and Monday afternoon following July 23rd; there saw Jack Morris; saw his car and noticed a two-wheel trailer, which had some indications

of having been recently used setting in the yard; there was some rope in the trailer, showing it had been used to tie stock of some kind in the trailer.

On cross-examination he stated: Jack told him where he got the cows he hauled to Tulsa, and told him that a darkey delivered them to his house early Friday morning in a V-8 pick-up and tried to describe him, but didn't know who he was; that he bought the cows and took them to Tulsa that day; "the next day I arrested him, the next day I went up to the stockyards and investigated and found he had penned two cows there on Friday; they had been sold and shipped, I found there was no records kept of the brands or descriptions, just weight is the only record they keep at that Tulsa Stock Yards."

When the state rested a demurrer to the evidence was interposed and overruled.

On the part of the defense Charles Forsythe testified that he was a cattle salesman at the Tulsa Stock Yards; that he was acquainted with Jack Morris, that on July 23rd sold two cows for him, to Niles; one weighed 805 pounds and the other 750 pounds; one was a big tall slim cow and the other a low cow, and both had horns.

M. E. Renfro testified that he lives near Sapulpa; that with two other fellows on a truck, he saw Jack Morris near Sapulpa, and he had two cows in a trailer, that had a flat tire, and they hauled the two cows to Tulsa Stock Yards for $3; one was a big tall dark red cow and the other was a smaller red cow, and they both had horns.

George Caddy testified that he lives at Grayson, had known Jack Morris four or five years; about two years ago sold Morris some cattle; at that time he sold him a red heifer and a red cow, and two or three yearlings.

Mable Morris testified that Jack Morris was her husband, and they lived half a mile south of Preston;

that she remembers when Sheriff Lenox was at their place, and previous to that they had taken two of their cows to Tulsa and sold them; one was a pale red cow with long horns and the other was a little red cow with a few spots on her, with horns; that in the suburbs of Sapulpa they had a flat on the trailer; a truck came by and stopped and they looked the cows over and tried to buy them but could not agree on the price, so her husband had them to haul the cows on to Tulsa; they loaded them on the truck and took the cows on; they left the trailer set there and followed the truck on around by Sand Springs to Tulsa, and got there right about noon.

On cross-examination she stated:

"We bought one of the cows from the Central National Bank in Sapulpa last year, and bought one cow from a colored man, named Caddy, about two years ago."

As a witness in his own behalf, Jack Morris testified that with his wife and little girl, and 13 year old boy, he took two cows to Tulsa, July 23, 1937; left home around 9 o'clock; had a flat at Sapulpa; went back to a filling station and got a man to fix the flat; a truck came by and asked if he wanted to sell the cows, and what he wanted for them; he said $65; the man said "I will give you $55"; he said "No," the man said, "Well, I will haul them on to Tulsa for $3," so they loaded them in the truck and he followed them to Tulsa; one was a dark red cow with horns, pretty long, about five years old, a little white on her; the other was a pale red cow, with tolerable long horns, about five years old; that he bought one from the Central National Bank about a year before, and the other from George Caddy about two years before. He further testified that on the following Monday the sheriff came to his place, and wanted to know the road to some man's place and went on. The following day he came back and said, "Jack, I want you to go to town with me." I said, "What is the matter, John?" He said:

"You took a couple of cows Friday, you didn't have a good title to." "I don't remember what I said. I saw he was serious and I asked him to let me explain where I got the cows, he said, 'No, you will have to tell that to the judge and jury where you bought those cows.' We started to town and he asked me where I got the cows, I told him several different places where I got the cows, I thought he was joking me, I told him where I got them finally.

Asked: "Have you ever been convicted of a felony and served time in the penitentiary?" Answered: "No. sir."

His cross-examination was in part as follows:

"Q. Have you ever been convicted of a felony? A. Explain to me what a felony is. Q. Like receiving stolen cattle? A. Yes, sir, I paid a fine for receiving stolen property. Q. Where were you convicted for that offense? A. Okemah. Q. How long ago has that been? A. It has been a year, I guess, something like that. Q. Anybody else ever seen these cows in your possession that you hauled up there that day? A. I don't know, they ought to; they have been running around there. Q. Did you tell the sheriff you bought them off a negro? Answer yes or no? A. No, I didn't tell him that. Q. Did you tell him you did not know who the negro was, and that he was there at your house about daylight that morning? A. Well, I do not want to tell you wrong. I could not say I did, because I do not remember any such talk as that going on. Q. Now, Jack did you later attempt to identify a negro by the name of Elijah Nash as the negro you bought them off? A. They had a negro in jail there and Mr. Eaton wanted me to go to look at this negro, Mr. Eaton said, 'Did you ever buy any cow of him?' and I said I believe I had, but not these two particular cows I had to Tulsa. Q. I will ask you if you didn't identify Elijah Nash as being the negro that had been to your house with those cows? A. No. Q. And I will ask you if you didn't attempt to identify a negro that lives down here by the name of Claud Durham, or Arthur Johnson as being the negro you bought them off of? A. No, sir. Q. You never told anybody you bought these cattle off

Elijah Nash or Arthur Johnson? A. No, sir, I told Mr. Eaton I bought cattle I thought from Nash, but not these two particular cows, I told him where I got the cows. By Mr. Eaton: Now we will introduce a stipulation. By Mr. Hays: It was his witness and we agreed to what he would testify and I want it introduced."

Thereupon the following stipulation was read to the jury:

"It is stipulated in case No. 3891, State of Oklahoma v. Jack Morris, it is agreed and stipulated that if the witness, Antone Copenhaver, were present he would testify as follows: That on Wednesday previous to July 23rd, 1937, the defendant, Jack Morris, came to his sales barn in Okmulgee between sundown and dark; that the defendant, Jack Morris, wanted to rent a pickup car or truck from Antone Copenhaver to haul cattle which he said he was going to get from his brother at Weleetka; that witness told Jack Morris that he would rent him a truck but that witness insisted on furnishing the driver, and the defendant, Jack Morris, replied that he would see his brother and probably see witness later, but that he never came back; that witness has furnished a truck to defendant on other occasions but always furnished the driver."

In rebuttal John Lenox, recalled, testified:

"Q. Did Jack Morris tell you that he bought these cattle in question of Mr. Henley at the bank and one off a negro at Grayson? A. No, sir, he didn't say he bought them from those men. Q. Did he ever tell you he bought any cattle from the bank or a negro at Grayson? A. No, sir, he told me he didn't know the negro's name he bought them from."

H. S. Christian, deputy sheriff, testified that he had known Jack Morris four or five years; went with Sheriff Lenox to Preston to bring him down; that after they arrived here he called lawyer Eaton to make his bond; they made the bond and he went home and came back the next morning; that Elijah Nash was in jail at that time, and Jack Morris asked to see him; he said he got a cow off a negro and could identify him if he could see the

negro that sold him the cattle involved in this action. "I called the negro down and Jack Morris said he was the negro he got the cows from, he said he bought only one cow from him that morning."

At the close of all the evidence counsel for the defendant moved the court "to instruct the jury to return a verdict of not guilty for the reason that the state has wholly failed to make out a case against the defendant." Which motion was overruled. Exception reserved.

The sole question to be considered is whether the facts proven warrant the conviction; in other words, is the evidence as a matter of law insufficient to sustain the verdict of the jury?

The commission of the crime was proved by uncontroverted evidence, and it is undisputed that the cows in question were taken from the owner's pasture and loaded on to a two-wheel trailer; that between midnight and morning on the date alleged a car with a two-wheel trailer with two head of cattle in it was seen by several parties at separate places on the highway between the pasture and the defendant's home near Preston. A witness for the state, James McFarland, testified that Jack Morris lived a half a mile south of him; that about four o'clock that morning he saw Jack Morris' car pulling a two-wheel trailer with two head of cattle in it, passing his home, going towards Jack Morris' place.

The evidence for the state as to the defendant's explanation of his possession of the two cows he sold at the stockyards at Tulsa on the date alleged, and his voluntary statements to the effect that he purchased said cows at his home place that morning from a negro whose name he did not know, was not directly denied.

We regard the circumstances established against the defendant amply sufficient to sustain the verdict. Where a conviction rests upon circumstantial evidence, and cir-

cumstances are proven from which the reasonable and logical inference of guilt clearly arises, and which exclude any reasonable hypothesis except the guilt of the accused, although the evidence is conflicting this court will not disturb the verdict for insufficiency of the evidence. Halbert v. State, 35 Okla. Cr. 329, 250 P. 436.

A question merely of fact is presented by the evidence, dependent wholly upon the credibility of the witnesses and the weight of their evidence. There could be no case suggested presenting a matter more proper for the decision of a jury. The jurors are the sole judges of the credibility of the witnesses who testified before them; and they are not bound to, nor can they be compelled to, credit the testimony of any witness, whether contradicted or not.

In the opinion of this court, there was sufficient evidence to warrant the jury in returning a verdict of guilty, and, the jury being the tribunal upon which by our Constitution and laws is especially imposed the duty of weighing the testimony, and having so weighed the testimony and found against the defendant, it is not the province of this court to disturb their verdict.

No other reason for reversing the judgment being urged, and no substantial error appearing in the record, the judgment of the district court of Okmulgee county herein is affirmed.

BAREFOOT and DAVENPORT, JJ., concur.