J. B. BROCK, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12815.

Court of Criminal Appeals of Oklahoma.

Feb. 3, 1960.

Boatman, Pugsley & Boatman, Okmulgee,
for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Presiding Judge.

J. B. Brock was charged by information in the Superior Court of Okmulgee County, Henryetta Division, with the crime of murder, was tried before a jury and convicted of the included offense of manslaughter in the first degree, and the jury assessed punishment at 25 years confinement in the State Penitentiary at McAlester.

The plaintiff in error, hereinafter referred to as defendant, was represented by diligent court-appointed counsel, and the appeal has been at the expense of the State.

The charging part of the information reads:

"That the said defendant, J. B. Brock, in Okmulgee County and State of Oklahoma, on the 1st day of November, 1958, did then and there unlawfully, wilfully, intentionally, feloniously and without authority of law, and with the premeditated design to effect the death of one Sam Fraley, did strike, beat, kick and stomp the said Sam Fraley with his fists and feet in and upon the said Sam Fraley's body, head, chest, face and stomach thereby inflicting mortal wounds upon the said Sam Fraley of which mortal wounds the said Sam Fraley did thereafter on the 1st day of November, 1958, die, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the State."

After the information was filed the County Attorney applied to the court and obtained an order for the committal of defendant to the Eastern State Hospital at Vinita, Oklahoma, for observation as to his mental condition, the question having been posed by defense counsel. The order was dated December 1, 1958. Thereafter and on December 13, 1958 the Medical Superintendent of the Eastern State Hospital, Vinita, furnished to the trial court a certificate to the effect that while the defendant Brock had a chronic lung condition, no

mental condition was found which would interfere with defendant's legal responsibility. The defendant was returned for trial, with the result as indicated.

For a proper understanding of the propositions of error raised on appeal, we shall as briefly as we may, summarize the evidence heard at trial.

Jacklin Brock, 11 year old daughter of the defendant was called as a witness for the State. She said that she knew what it meant to tell the truth. She said that on November 1, 1958 she saw Mr. Fraley, the deceased, and her father, the defendant, when they arrived at the home. Said she:

"A. Well, Daddy came in and he told Mr. Fraley to get out of the car and Mr. Fraley started to and Daddy— it looked like Daddy kicked him out. I don't know if he did or not, but it looked like it; and we were eating dinner—I mean supper—and when Daddy came in we went to the door and Daddy started hitting him with his hands and kicking him; and he did it for a little while and then went away— Mom and Daddy.

"Q. How long was your father gone? A. I don't know.

"Q. Five or ten minutes? A. I don't know exactly.

"Q. Did he come back? A. Yes.

"Q. Then what did he do when he came back? A. He started—he started kicking him and hitting him with his hands and feet."

On cross-examination Jacklin denied that her daddy came into the house after he got out of his car. She said that she watched her father and Mr. Fraley from the back door.

Mr. John Cox testified that he lived west of Henryetta; that his mailing address was Route 1, Weletka; that on November 1, 1958 the defendant Brock came by his house and said that he had killed a man and asked witness to take him to town to the sheriff. Witness said that he got ready and defendant went to his mother's place and witness

'phoned Dan Shepard, deputy sheriff, and they met Mr. Shepard out by Kirk's Drive-In, and then they went to where the body was. He said that he saw the body in defendant's yard and it was bloody and beaten up and that he later learned that it was Sam Fraley. He said that the clothing was open in front and witness could see that one side was caved in, and there was a lot of blood about the head, ears and an arm was crooked as if broken. He said the body was on the ground 6 or 8 feet from J. B. Brock's back door. Witness further testified that after they got to defendant's home Mr. Brock stated: " 'Well', he said, 'he's dead as he'd ever be. We might as well make some coffee.' " But witness said they did not drink coffee. They were awaiting the ambulance.

Dan Shepard, deputy sheriff, testified that he was called to go out west of Henryetta on November 1, 1958; that he met the defendant Brock at Dann's Drive-In; that he was in a car with a Mr. Cox and he transferred defendant to his car and drove to defendant's home. He said that defendant told him that he had killed Sam Fraley; that he found Fraley lying on the ground in defendant's back yard, dead. He said the deceased's left breast appeared to be caved in and his left arm was broken; that at this time defendant was beating his hands together and said: "Hell, I'm freezing to death, let's go get some coffee, that man is dead as hell." Witness said that the deceased was about 70 years of age. Severe cross-examination with many improper questions failed to change the officer's testimony.

Irene Wright testified that she lived at 140 West Broadway, Henryetta, the second door from where Sam Fraley lived; that she had seen the defendant come to Fraley's place, and about a month before the death of Fraley defendant was out at Fraley's place then came over to her house and in the course of conversation told her, "I'm going to kill that old son of a bitch."

Lawrence "Skeet" Beasley testified that on November 1, 1958 the defendant came to his place on B Street, Henryetta, looking for Sam Fraley; that he and Brock each drank a cup of coffee and Brock asked the wife of witness if she had Fraley hid out.

W. R. Campbell identified State's exhibits 1 through 7 as pictures that he made at the Buchanan Funeral Home, Henryetta, of the body of Sam Fraley the morning after he was killed. Witness at first said he took the pictures the morning of September 2, 1958, then said he was confused as to date, but that it was the morning after Fraley was supposed to have met his death. After cross-examination of witness, the pictures were received in evidence. They showed various wounds about the head and body of the deceased.

Dr. Carlton E. Smith testified that he examined the body of Sam Fraley at the Henryetta Hospital the night of November 1, 1958. He said the body arrived by ambulance about 10 o'clock at night; that "the man was dead on arrival; his eyes swollen shut; his face was bruised and his left chest was caved in and ribs fractured; his left wrist, both bones, were broken; that there were numerous abrasions on the left leg."

Witness gave it as his opinion from his examination of the body that death was caused by having the left chest caved in in the region of the heart with multiple fractures of the ribs. He identified State's exhibits 1 through 7 as a true representation of the wounds that he found. It was the opinion of witness that the ribs were caved in and the arm broken by something heavier than a fist.

On cross-examination witness said that he did not make X-rays or perform an autopsy because that had not been asked.

Alta Christian testified that Sam Fraley was her father and that when he met his death he was 69 years of age and would have been 70 on March 7, 1959.

This closed the evidence on the part of the State. The court overruled a demurrer by defendant to the evidence, and a motion for mistrial.

The defendant called Dr. D. W. Mc-Cauley as a witness. He qualified as a

chest expert and said that broken ribs without complications would not cause death; that ribs might be broken by the blow of a fist. He thought without X-ray to say that broken ribs caused death would be a guess.

On cross-examination after viewing State's exhibits 1 through 7, witness was asked:

"Q. Doctor, if a person had been severely beaten as demonstrated by these pictures here, and [died] a short time after the beating, what would you say would be the cause of death or could the beating be attributable to the cause of death? A. Very much so, yes.

"Q. And it's quite possible, you testified that complications on broken ribs—what do you mean by complications, Doctor? A. If the ribs, say, would puncture a lung sufficient to collapse it or cause a hemorrhage.

"Q. That could cause it? A. Yes.

"Q. You know Doctor Smith, don't you, of Henryetta? A. Yes, sir, very well.

"Q. He's a regularly licensed practicing physician? A. Yes, sir.

"Q. You consider him qualified? A. Very much so.

"Q. And you think that he is qualified to the extent of giving his professional opinion on a case? A. Yes, sir."

Sam Watkins, a witness subpoenaed by the State but not used, was called to testify for the defendant. He said that he had lived in Henryetta since about 1924 and operated a small grocery; that he had been acquainted with Sam Fraley, who traded with him; that he last saw him on November 1, 1958 at about 3:30 p. m.; that he came to his store with the defendant Brock; that Brock endorsed a check that was not sufficient to pay Fraley's grocery bill; that witness gave Fraley some candy. He said that Brock often drove Fraley to the store to get groceries. Witness did not notice any discord between the parties. Both men traded with him.

The defendant testified in his own defense. He said that he was 34 years of age, had five children and was expecting a sixth any day. Asked how he made a living he stated that he got a little check from the Public Welfare, and did odd jobs. The Public Welfare aid amounted to $20 per month. Defendant said that he received medical treatment at the University Hospital, Oklahoma City; that since his arrest the Public Welfare agency had been taking care of his family. He said that he and the deceased had been friends for a long time; that they drank liquor together; that he had had him out to his home a number of times. He said that prior to November 1, 1958 he had a little trouble with the deceased one time. That they were at the home of a Miss Wright, talking about a dog and Fraley got impatient to go and he told Fraley that he would go home when he got ready and Miss Wright warned defendant that Fraley had a knife and she got in between them. He said Fraley had been drinking at the time.

Defendant said that after he got his mail on November 1, 1958, he could not say what time in the morning, he got his $20 check and went by to see Fraley and that Fraley had not received his check yet, so defendant went to the bank to pay $16 on account and later went back and got Fraley and took him to the grocery store to pay for his groceries, and that after that they got some whiskey and did some drinking. That late in the afternoon he drove Fraley to his home; that Fraley wanted to give the candy given him by the grocer to defendant's children. Defendant denied that he had gone to State's witness Lawrence "Skeet" Beasley's home looking for Fraley. Defendant denied that he and Fraley had any words or disagreement on the way to his home, but said that after he got to his home he and Fraley got out of the car and went inside his home, and Fraley got to using obscene language before defendant's family, and he got Fraley outside the house. That he was afraid

Fraley would cut him, although he saw no knife, but that Fraley told him he would cut his guts out, so he hit Fraley and then went to a neighbor's house to telephone Sam Shepard for an ambulance, but the neighbor would not let him use the telephone, so he returned home and got his wife and children and drove to John Cox's home to telephone. He denied that he assaulted Fraley when he returned home. He said that after leaving Cox's home he met the deputy sheriff out at Kirk's Drive-In.

On cross-examination as to what Fraley was saying that caused the trouble, he said that Fraley had put his hand on defendant's wife and said, "Come with me sweet baby", and then defendant got Fraley out of the house and was trying to get him in the car to take him back to town, and he thought that Fraley was trying to get a knife out of his left-hand pocket so he hit Fraley and knocked him down, but witness said that he could not say whether he kicked deceased or not.

Defendant admitted that he had been drinking, but denied that he was drunk— said he just felt good. He said that he let his wife and children out at his mother's home before he drove on to the home of Johnny Cox to call deputy Dan Shepard.

Defendant said that his little daughter was mistaken in saying that he attacked the deceased when he came back the first time from trying to get the use of a telephone.

This completed the evidence.

For reversal, defendant argues his case under four propositions.

█ It is first claimed that defendant was required to go to trial without having been served with a sufficient list of witnesses and their addresses. As pointed out by counsel, the Oklahoma Constitution, Article II, § 20, states:

"In capital cases, at least two days before the case is called for trial, [the defendant] shall be furnished with a list of the witnesses that will be called in chief, to prove the allegations of the indictment or information, together with their postoffice addresses."

Defendant's exhibit No. 1, received in evidence, and being a copy of the information, shows on the back thereof a list of the State's witnesses, with their addresses. A number of Henryetta witnesses were listed simply "Henryetta, Oklahoma". The copy of the information was delivered to the defendant and counsel at the time of defendant's arraignment, which was on January 6, 1959, and being three months prior to trial. As pointed out by the Attorney General, some of the witnesses to whom counsel specifically objected by name in his general written objection, were not called to testify for the State, and others were shown to have the addresses given on the information. The State called as a witness Alta Christian, daughter of the deceased. Her address on the information was given as Route No. 1, Checotah. She so testified on cross-examination. Counsel attempted to pin her down to a box number, but she said she did not have a box number, but her address was simply "Route No. 1, Checotah". Also, State's witness W. R. Campbell, photographer, stated that his address was simply "Henryetta", as listed on the information. Sam Watkins, witness, objected to on account of claimed insufficiency of address, was not used by the State, but by the defendant. His address had been listed simply as "Henryetta". Specific objection was made when the witness John Cox was called by the State to testify, because his address had been listed simply as "Rural Route, Henryetta". This, in face of the fact that Cox, when he testified, was shown to have been a friend of the defendant, and to whose home he went to telephone after the killing.

No showing was made that the addresses given were incorrect or that during the three months prior to trial defense counsel had been unable on account of the addresses given, to contact the proposed witnesses. We are convinced that Henryetta is not of sufficient population but what slight inquiry would have enabled anyone desiring to contact the listed State's wit-

nesses, to have done so, with the aid of the addresses given. A careful reading of the record fails to disclose any evidence of the addresses as shown on the information causing the defendant any detriment, or that he was prejudiced in any way.

■ It is urged that the court erred in admitting State's exhibits 1 through 7, being photographs of the deceased showing head and body injuries. Counsel states that Oxendine v. State, Okl.Cr., 335 P.2d 940 supports his position. We cannot agree. In the Oxendine case the deceased had been shot through the chest, but the photographs were not limited to the area of the body showing the bullet wounds, but the pictures were made after autopsy, showing the entire nude body of the young woman, with long cuts along each side crudely sewn up. The pictures were shocking to a viewer. There was no question but that the victim had met her death by the bullet wounds. Here, the victim's ribs in his left chest had been caved in, the bones of his left wrist broken, there were severe head injuries. The State had alleged that these fatal injuries were caused not only by the use of the fists, but by stamping. The defendant's 11 year old daughter testified to seeing her father kick the deceased out of her father's car and hit and stamp him. There was a question as to whether the injuries and death could have been caused solely by the use of fists. The defendant admitted striking deceased with his fists, but could not remember stamping him. He had claimed self-defense, when there was evidence that defendant departed the scene leaving deceased on the ground and a few minutes later returned and began stamping him again. Dr. Carlton Smith, who examined the body, testified to injuries which could not have been accounted for by the mere use of fists. The photographs corroborated the testimony of the little girl and that of the physician as to the nature of the injuries.

■ It is next contended that the court erred in refusing to give defendant's requested instructions. We have carefully read the instructions requested, and do not find error in the failure of the court to give them. Requested instruction No. 1 is as follows:

"Ladies and Gentlemen of the jury: You are instructed that in this case there has been no evidence introduced of the use of a deadly or dangerous weapon. You are therefore instructed that unless you find as independent evidence that the defendant had a premeditated design on the life of the deceased, you must return a verdict of not guilty."

Requested instructions Nos. 2 and 3 read:

"You are instructed that malice or design to effect death can be implied only when homicide is committed by the use of a dangerous weapon or instrument, in such a manner as naturally and probably to cause death.

"Gentlemen of the jury: You are instructed that no inference of an intent to kill or take a human life is warranted from striking a person on the head with a fist, notwithstanding death results therefrom."

As argued by the Attorney General, such an instruction as No. 1 would have been contrary to the proven condition of the body and the testimony of the little girl, heretofore recited, as to the use of the feet, and would have also precluded the possibility of a conviction for manslaughter. There, premeditated design is not an element.

The same is true with reference to instruction No. 2, which would have required the existence of proof of malice or design. Instruction No. 3 would have been subject to the same objection and further to the fact that it would have ignored the existence of the testimony of the use of more than a fist. As heretofore pointed out, and set out in defendant's testimony, while he did not admit using anything other than his fists, he did not deny the testimony as to the use of his feet. He merely claimed that he did not know what he did. He

said that he had been drinking but at the same time he reiterated that he was not drunk. Of course, such would not have excused him.[1]

The use of the feet in stamping and kicking a prostrate person may reasonably be expected to cause serious injury or death of the person, depending on the manner of use of the feet, whether feet shod or not, and the vigor used in inflicting the blows.[2] At all events, the death was shown to have been caused by the crushing by defendant of the ribs in the left breast of the deceased. And he was not convicted of the charge of murder, where intent might be an element, but the included offense of manslaughter in the first degree, where intent is not a necessary element.

21 O.S.1951 § 701, provides:

"Homicide is murder in the following cases.

"1. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being.

"2. When perpetrated by any act imminently dangerous to others ·and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

"3. When perpetrated without any design to effect death by a person engaged in the commission of any felony."

Section 711 of the same Title provides:

"Homicide is manslaughter in the first degree in the following cases:

"1. * * *

"2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide. * * * "

Here the evidence showing more than blows by the fist precluded the giving of the three instructions requested.

■ Finally, it is argued that the assistant county attorney in his closing argument to the jury three times referred to the defendant as a "mad-dog" and thus so inflamed the minds of the jurors as to prevent the defendant from having a fair and impartial trial.

The Attorney General contends that the record reflects that the prosecutor did not directly refer to the defendant as a mad-dog, but rather he used the expression "mad-dog killer" as descriptive of the kind of killing which was involved in the case, as shown by the evidence.

The evidence discloses that the defendant admitted the killing, and the little girl who witnessed it and who said after the victim was prostrate the defendant returned minutes later and resumed the stamping and kicking, and then the seven pictures showing the crushed left chest and the extensive head injuries, and broken wrist, demonstrated the viciousness of the attack, and the jury could very well have concluded that the perpetrator was motivated by sadism. So we think this case must be governed by the rule so often adhered to by this Court that: it is only when argument by counsel for the State is grossly improper and unwarranted upon some point which may have affected defendant's rights, that a reversal can be based on improper argument. Kennamer v. State, 59 Okl.Cr. 146, 57 P.2d 646; Larkey v. State, 95 Okl.Cr. 338, 245 P.2d 751. That the argument did not result in inflaming the passions of the jury is clearly shown by the fact that the conviction was merely for manslaughter and a 25 year sentence. It might have been for murder, and the evidence would have justified a life sentence.

This case demonstrates the effectiveness and hard work of court appointed counsel, and the expense the State goes to, to see

1. 21 O.S.1951 § 153; Mott v. State, 94 Okl.Cr. 145, 232 P.2d 166.

2. Smith v. State, 79 Okl.Cr. 151, 152 P.2d 279.

**28**

that no citizen is convicted without due process of law.

From what has been said, the verdict and judgment must be, and is, affirmed.

NIX and BRETT, JJ., concur.