Billy E. GRIMES, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A–12942.

Court of Criminal Appeals of Oklahoma.

Oct. 18, 1961.

Harris & Field, Lawton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, Judge.

This is an appeal by Billy E. Grimes, who was convicted in the district court of Cotton County, Oklahoma, on March 31, 1960 on a charge of the murder of his father, George L. Grimes, allegedly committed on December 3, 1959. The case was tried to a jury, and on its finding of guilty, judgment and sentence was entered April 14, 1960, from which this appeal has been perfected.

As briefly as possible, the facts developed on purely circumstantial evidence are substantially as hereinafter set forth.

It appears that the twenty-year old defendant saw his parents on Thanksgiving day, November 26, 1959. Two days later he was in Temple, Oklahoma, where he contacted a Mr. Norman at Seaton's filling station concerning borrowing three or four hundred dollars, or going on defendant's note for such sum, neither of which Mr. Norman did.

It then appears that the defendant, who had been away from home for some time, next contacted his parents in the town of Walters at a public drawing about four o'clock on the afternoon of December 3, 1959, as he told Sheriff Kerr. It is not apparent why the contact was made there, but it seems arrangements were made for his mother to pick up a pair of trousers belonging to defendant and that had been left at the cleaner's, and take them home with her, which the undisputed evidence and de-fendant's admissions clearly established that she did. What the defendant's real object in contacting his parents in Walters was, is a matter of inference. In the light of the foregoing, it could have been because he needed money.

Instead of Mr. and Mrs. Grimes going home from Walters, they apparently abruptly went from Walters to Lawton, Oklahoma, where the undisputed evidence shows they bought groceries, consisting of meat, flour, soap, milk and a few other ordinary items, about 5:35 P.M. It was conclusively established that it was from 26 to 28 minutes drive from Lawton to the Giles home, eight miles northwest of Walters. Presumably they reached their home around 6 P.M., or shortly thereafter. The grocer in Lawton was the last known person to see them alive, except their son, the defendant, who admitted in a signed and witnessed statement that he saw them, but said it was about 5:30 P.M., at their home, and then only for about fifteen minutes, and that he helped carry in the groceries and other things from the car. The statement will hereinafter be further detailed.

On Sunday, December 6, 1959, a neighbor, Henry Renschen, and two other men about 1 P.M. discovered a dead calf in Mr. Grimes' pasture, and went to his home to advise him. On arrival at the house they smelled escaping butane gas. They could not arouse any one, so they pushed the door open and discovered the dead bodies of Mr. and Mrs. Grimes, and that the gas stove jets in the living room and dining room were open, but not lighted. The hot water heater was burning. Mr. Grimes had been shot in the back through the heart. The .22 calibre bullet was found on his chest, after passing through his body. It was in a good state of preservation. Mr. Grimes body was in a little hall-way between the living room and dining room. Grass on his clothing and a pool of blood on the ground outside the back screen door established the fact that his body had been dragged from outside near the back door to where it was found. A blood analysis showed that the blood found in the outside pool where his

body had fallen was the same as that from Mr. Grimes' body. The grass on his clothing was the same as that from the back yard.

Mrs. Grimes' body had been shot twice, once in the back and once in the front of the chest, with a .22 calibre gun of some kind. The upper part of her body was lying on a red rubber foot-mat on which she had apparently been dragged from the back porch to the door-way between the kitchen and dining room.

The sheriff and crime bureau agents were called and in addition to some of the foregoing things, their investigation disclosed a jacket in the dining room that had blood on the front which the chemist testified was the same type of blood as that of Mr. Grimes. The defendant admitted to the officers that the jacket was his. In the pockets were some Winston cigarettes, the brand the defendant smoked, and his check book. The defendant's bloody shirt was also found at the scene of the crime, but no trousers. There was an empty shell-hull found in one of the pockets of the jacket, the same kind as two others found on the ground, one about three feet from the blood on the ground about twelve feet south of the back door, and one 50 or 60 feet south of the house, in line with the drive-way; apparently all used in affecting the death of Mr. and Mrs. Grimes, according to the testimony of the ballistic expert, who made tests. The three empty shell-hulls were all fired from the same gun, the expert testified. The gun that fired those shells was never found. Two unfired shells of the same kind were found about thirty feet out in the back yard. These shells and cartridges all looked new, the expert testified. A twenty-two rifle found on the gun rack upstairs, the expert's tests disclosed, was not the gun from which the three shells that killed Mr. and Mrs. Grimes were fired.

It was clearly established that the deceased, George L. Grimes, carried a .22 rifle in his pick-up truck. The theory of the state was that the deceased was killed by a gun that was disposed of, and not the gun upstairs on the rack. It was interesting to note that though the defendant claimed he took the gun out of his father's pick-up and carried it upstairs at his father's suggestion, he did not know whether he put it on the ironing board, or in the gun rack. The jury concluded he did not know where the gun was upstairs, because he didn't take it up there. Apparently it concluded he was making a blind guess as to its whereabouts, to bolster his story.

There were nitrate burns on Mr. Grimes' clothing, indicating he was shot in the back, since the nitrate is wiped off as the bullet enters. Mrs. Grimes had nitrate deposits about the hole in the front of her blouse and also around one hole in the back, indicating she was shot once in the front, and once in the back.

About 6:18 P.M. on December 3, 1959, a telephone call was made from the Grimes home to the Walters telephone operator from a person who identified herself as Mrs. Grimes. Mrs. Johnson, the operator, testified that Mrs. Grimes asked: "Will you please get me a doctor." Then there was a pause, a little struggle in the back ground as though the party was having difficulty hanging up the receiver, and a second before the receiver went up a cry of "Help" was heard. Mrs. Johnson reported this to her managing operator, Mrs. Bilbrey, and at 6:19 Mrs. Bilbrey called the telephone back, and testified:

" * * * and the number didn't answer, and I rang several times, and I was about ready to take my connection down and someone on the line answered. I asked them if there was someone there wanting a doctor, and he said, 'no'. the voice said 'no', and I said, 'Is your number 614–J–3, and he said, 'Yes, it is', and I said 'There is a woman there calling a doctor', and he said, 'There is no one here wanting a doctor', so I thanked him and hung up. * * *

"Q. Was it a young voice, or an old voice? * * * can you identify it as to the age of the person? A. It sounded like a young person.

"Q. Was it a male voice, or a female voice? A. A male."

Investigation at the scene of the crime showed the telephone had been jerked from the wall and the connection broken, evidently after the foregoing conversation.

The screen on the back door appeared to have been pushed out, as though by somebody's head. A splintered piece from the back screen door and the spring latch were found about six feet south of the door in the yard. It appeared to be a fresh break. The hook had been pulled out of the screen. The defendant had a screen burn on his forehead at the time he was interviewed by the officers, which he told them he got down at Evelyn Quade's. Neither Evelyn or anyone else was called to testify he did get the burn at her place.

▉ Sixteen ordinary black and white photographs of the premises and the dead bodies were taken and offered in evidence. These, in our opinion, were all admissible, under the authorities. All of the photographs were described to be true and faithful reproductions of the conditions at the scene of the crime, as they were found when the crime was discovered. They were admissible as appropriate aids to the jury in applying the evidence. It has been held such photographs are admissible whether they relate to persons, things or places. McNutt v. State, Okl.Cr., 288 P.2d 418; Nelson v. State, Okl.Cr., 288 P.2d 429; Brock v. State, Okl.Cr., 349 P.2d 20; Hudman v. State, 89 Okl.Cr. 160, 205 P.2d 1175; Cody v. State, Okl.Cr., 361 P.2d 307; Pate v. State, Okl.Cr., 361 P.2d 1086.

No objection was made to these photographs, except as to three of them, two of Mrs. Grimes, and one of Mr. Grimes. In the latter, part of the photograph was ordered eliminated, and the balance, showing the wound in Mr. Grimes' chest at the point of the exit of the bullet was admitted.

Mr. L. E. Daniel, a farmer living about four and three-quarters miles east of Walters, and his hired man, Harmon Golden, found a pair of blood-covered pants in the tall grass and weeds across the road from a fence they were mending. They called the sheriff, who came out and took possession of them. The defendant, when interviewed by the officers, admitted the pants belonged to him. Mr. Golden had gone across the road to relieve himself and found the trousers rolled up in the tall grass. When the pants were unrolled it was discovered they had blood on them, which was the same type as that of Mr. Grimes, and the same type as that on the shirt and jacket, and as that found in the yard near the back door steps.

On December 10, 1959 the defendant made a signed, witnessed statement, which was offered in evidence by the State without objection from the defendant, and on which the defendant relied for his defense—declining to testify in his own behalf. The defendant was advised of his rights before making the statement, and made it voluntarily, before his arrest. The statement, containing corrections in defendant's handwriting, is in substance as follows:

It related that defendant got to his father's home about 5:30 P.M. (this was the time his parents were in Lawton at the grocery). Just after he got there he said his parents arrived. He had not been home since Thanksgiving, and was staying at the Line Hotel in Walters. He had also been working in Wichita Falls, Texas, and other places, it appears. He said he went in and changed clothes in the dining room, where his shirt and bloody jacket were found, but his trousers were not found there. He then helped his mother bring in the groceries, and his father brought in the laundry. (The bloody trousers, found on the highway, were the defendant's as has been hereinbefore pointed out. The trousers his mother picked up at the cleaners were found in his room at the hotel, the sheriff testified.) Defendant said he took a .22 rifle upstairs and put it in the gun rack or on the ironing board. (The ballistic examination disclosed that the fired shells found on the premises, as hereinbefore set out, were not fired from that rifle, but from a gun that was never found.) Defendant did not look

around to see if there was anyone upstairs, but he did orally tell officer Lovett that if anyone had been up there he would have seen them.

Defendant said he was at home in the house about fifteen minutes from the time he arrived until he left. Though it was about suppertime, he did not stay. When he left he said he saw a car parked about one hundred yards north of the intersection west of his parents' house, but he did not observe the color.

The defendant said he reached Walters about seven o'clock, where he contacted Nick Mejio, and they drove around a while. They then went to Roberta Rea Elk's with Danelle Toquothy and his girl-friend, to baby-sit. They stayed there until about 11:45, when Roberta returned, then the girls and Nick and defendant drove to Lawton to eat. Thereafter they took their girls home, returned to the hotel and went to bed.

The defendant said he was around Walters and Lawton, making several trips back and forth to Lawton on Friday, until about 11:30 P.M. when he drove to Stigler to pick up some clothes he had left there. In Stigler he saw Marshall Spence, Dewayne Martin, Bob Garrett and the owner of the Sigmon Hotel.

On Saturday he left Stigler about 8 A.M. and arrived back in Walters about 1 P.M., when the sheriff and trooper Barber notified him of the death of his parents. The sheriff testified he checked out the statement with the parties named therein, and their association with the defendant was confirmed. None of them were called at the trial by the defendant. It does seem that the defendant was quite restless and on the go much of the time from the time he left his parents' home.

The sheriff testified that when Billy Grimes was notified, only of the deaths of his parents without details as to how they met their deaths, defendant did not inquire how they died, but exclaimed, "Who would want to kill my parents?" This may have been considered as some evidence of a conscious knowledge that they had been murdered, and had not lost their lives in some innocent or accidental manner.

At the scene of the crime, all evidence of finger prints had been removed except one on the refrigerator door, which Paul Sterling, fingerprint expert, said in his opinion was that of the defendant.

The defendant offered four witnesses in his defense. Paul Sterling, State's fingerprint expert, whose testimony is substantially as above set forth. Bill Ogletree, mortician, who was examined relative to blood spots on the floor and other conditions relative to the bodies. J. T. Wyatt, the embalmer, who also testified to body positions of the victims, and blood on the clothing of the victims, and other places, and as to the removal of the bodies. Gwendolyn Walker, Billy Grimes' sister, who lived in Colorado, and who testified that she was with her brother from 7 A.M. Monday, until after the funeral. She was also with the defendant at the preliminary hearing, and during the trial hereof.

██ The court properly sustained an objection to a question to elicit from Mrs. Walker if her brother's conduct during the time she had been with him since the death of their parents reflected any indication to her of Billy's guilt. The court properly ruled that was not a matter of her opinion, but was an issue to be determined by the jury.

Other than these witnesses, the defendant offered no proof in his behalf.

None of the parties referred to in the statement of the defendant were called to testify, particularly as to the forehead burn the defendant said he got down at Evelyn's. It is one thing to tell the sheriff something is true in corroboration of a person's alibi, and quite another thing to swear that such is true in court under the solemnity of an oath and the perils of perjury. If the defendant got the burn at Evelyn's it would have been most helpful to the jury to have learned it from others on the witness stand, and not from a self-serving declaration made by the defendant confirmed by parties not under oath.

■ There are so many other inconsistencies and unexplained circumstances clearly pointing to the defendant's guilt herein that we cannot say the jury's verdict is not sustained by the evidence. The defendant, notwithstanding his attempt to place himself away from the premises at the time of the murder, could have done all the things he said he did with his friends and still have committed these atrocious crimes. Moreover, the telephone call by Mrs. Grimes, following the shooting of Mr. Grimes, the finding of defendant's bloody jacket and shirt in the dining room, the fired shells in the yard and the one in the jacket pocket, the finding of his bloody pants on the highway, the finding in his room at the Hotel Line of the pants his mother picked up at the cleaners, the bulge in the screen door, the screen burn on his head, the discrepancy in fixing the time and other things are circumstances indicative of his guilt, and lead to the belief there can be no other logical conclusion. The jury believed that he shot his father in the back in the yard by the steps from a distance, that his mother attempted to call a doctor, that she did not disclose the circumstances precipitating the need, for to have done so would have exposed her son to the law; that the defendant jerked the phone from her, she called for help, and he shot her in the chest, then she ran to the back, out the door and slammed it to in the defendant's face; he then shot her a second time in the back, then dragged his father into the house and bloodied his jacket, shirt and pants in so doing. He then laid his mother's body on the rubber mat and dragged her into the house.

The jury no doubt was convinced the cause of the killing was over money matters. The defendant in his haste to leave forgot his cigarettes and check book. He turned on the gas in anticipation that a violent explosion and all-consuming fire would erase all evidence of his crime. The jury believed he did remove his jacket and change his shirt in the dining room at his father's home, picked up the fresh pants and left, actually removing the bloody pants on the road back to Walters, where he abandoned them, and put on the freshly cleaned pair. A perfect crime would have resulted had the hand of province not interfered—a dead calf, a mended fence, and an explosion and intended fire that did not occur, as well as an unanticipated telephone call, an empty cartridge hull in the pocket of the bloody jacket, and a bloody pair of pants on the highway, all present conclusive facts which, unexplained, are most convincing.

This crime for some mysterious reason was destined to disclosure from its inception, though the murder weapon was never found.

■ It is further urged that not an iota of evidence establishes motive, intent or premeditated design. It has been held that design to kill is inferred from the fact of killing, unless the facts and circumstances raise a reasonable doubt as to whether such design existed, and that the issue of design is one for the determination of the jury. Swarb v. State, Okl.Cr., 358 P.2d 850, 851. When the victims of a double killing are fatally shot in the back, the design to kill is evident beyond doubt.

■ In Hendricks v. State, Okl.Cr., 296 P.2d 205, it was held:

" 'Alibi' is physical circumstance and derives its entire potency as a defense from fact that it involves physical impossibility of guilt.

"To entitle defense of alibi to consideration, evidence must show that at very time of commission of crime accused was at another place so far away or under such circumstances that he could not, with ordinary exertion, have reached scene of crime so as to have participated in commission thereof."

The defendant's later movements after he reached Walters are of little value to him in the establishment of a defense as set forth in his statement. They are, however, an indication of restlessness. He jumped from here to yonder, and was constantly on the move.

■ We are in no position to interfere with the jury's verdict, since the same is logically and reasonably sustained by the evidence. The facts and circumstances established herein are consistent with the guilt of the accused, and consistent with each other, and inconsistent with any other reasonable hypothesis than that of defendant's guilt beyond a reasonable doubt.

■ In Pruitt v. State, Okl.Cr., 290 P.2d 424, 434, a case, as herein, based entirely upon circumstantial evidence, with a much greater likelihood of innocence than in the case of this defendant, we said, quoting from prior decisions:

"Rucker v. State, 64 Okl.Cr. 259, 79 P.2d 629, 630:

" 'Where there is evidence, although entirely circumstantial, from which the jury may reasonably and logically find a defendant guilty, the weight, credibility and probative effect of such evidence is for the jury, and this court will not disturb its verdict for insufficiency.'

"In the body of the opinion, the late Judge Doyle further said, 64 Okl.Cr. at page 263, 79 P.2d at page 631:

" 'We think a verdict of a jury based upon circumstantial evidence comes to us as any other verdict, and unless we can say that the inference of guilt drawn from the evidence is wholly unwarranted, we cannot interfere.'

"Williams v. State, 97 Okl.Cr. 229, 263 P.2d 527. See also Morris v. State, 67 Okl.Cr. 404, 94 P.2d 842, 845. This is another opinion by Judge Doyle in which the foregoing rule was announced, and wherein he further said:

" 'We regard the circumstances established against the defendant amply sufficient to sustain the verdict. Where a conviction rests upon circumstantial evidence, and circumstances are proven from which the reasonable and logical inference of guilt clearly arises, and which exclude any reasonable hypothesis except the guilt of the accused, although the evidence is conflicting this court will not disturb the verdict for insufficiency of the evidence. Halbert v. State, 35 Okl.Cr. 329, 250 P. 436.

" ' 'A question merely of fact is presented by the evidence, dependent wholly upon the credibility of the witnesses and the weight of their evidence. There could be no case suggested presenting a matter more proper for the decision of a jury. The jurors are the sole judges of the credibility of the witnesses who testify before them; and they are not bound to, nor can they be compelled to, credit the testimony of any witness, whether contradicted or not.

" 'In the opinion of this court, there was sufficient evidence to warrant the jury in returning a verdict of quilty, and, the jury being the tribunal upon which by our Constitution and laws is especially imposed the duty of weighing the testimony, and having so weighed the testimony and found against the defendant, it is not the province of this court to disturb their verdict.'

"Such is the situation here presented."

The defendant next complains of an isolated statement of the special prosecutor in his opening statement to the effect:

"We believe the evidence will show that Mr. and Mrs. Grimes of course owned a nice estate here; that the defendant and the sister were the sole and only heirs of the estate."

This statement, we believe, was not made in bad faith. We can conceive of a number of reasons why it would have been made in absolute good faith, and no proof later offered thereon. The matter thus complained of was never referred to again in the argument by counsel.

■ The leading case cited by the defendant to support this contention of prejudice on this ground is Hilyard v. State, 90 Okl.Cr. 435, 214 P.2d 953, 28 A.L.R.2d 961. Therein evidence of bad faith was manifest by the county attorney's emphasis in his argument to the jury of this un-

supported statement. The defendant herein does not urge it was made in bad faith, and we do not believe it was so made. Moreover, the court's instruction No. 6 advised the jury that they should disregard any statement of counsel and not consider it as evidence, unless it were made as a stipulation or admission. In the argument the almost total lack of defense in this case makes this matter of little weight in face of the chain of convincing circumstances. The cases relied on by the defendant are cases of apparent bad faith where the matter objected to was aggravated by reiteration and misconduct. Cases in point with our conclusion are cited by the defendant in his brief. Shacklett v. State, 23 Okl. Cr. 4, 211 P. 1063; Scott v. State, 59 Okl. Cr. 231, 57 P.2d 639; Lee v. State, 67 Okl. Cr. 283, 94 P.2d 5; Jackson v. State, 67 Okl.Cr. 422, 94 P.2d 851.

■■■■ The defendant complains that the jury was permitted to separate during recesses before final submission of the case to them. The record is clear that the defendant waived the right to now assert this as error, since he did not register the slightest objection thereto during the trial. The answer to this contention is clearly stated in Cox v. State, Okl.Cr., 283 P.2d 545, 557, wherein it was held:

"There was no request from counsel for the accused that the jurors be kept together during the trial. Even in a capital case it is discretionary with the court as to whether the jury should be kept together before final submission of the case. Fry v. State, 91 Okl. Cr. 326, 218 P.2d 643.

"In Wilcox v. State, 69 Okl.Cr. 1, 99 P.2d 531, 532, it was held:

"'Where the proof shows that the jury is permitted to separate after the case has been finally submitted, the defendant is entitled to the presumption that such separation has been prejudicial to him, and the burden is on the prosecution to show that no injury could have resulted therefrom to the defendant.

"'Before the final submission of a case the legal presumption is that the jurors performed their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that during an adjournment of the trial the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced.'"

The rule as therein announced is amply supported by authority. This contention, under this record, is without merit.

■■■ Defendant urges that evidence of certain cartridges, empty shells, and the gun found on the rack were in no way connected with the crime and were therefore inadmissible. With this contention we cannot agree. The record shows that they all played an important part in that they pointed to the concealment or disposition of the murder weapon. Thus in the process of elimination they were enlightening. All were found on the premises, and may or may not have been a part of the res gestae. It was essential that they be properly accounted for or eliminated.

■■■ Complaint is made of the rubber door-mat being introduced into the record, it being involved in the transfer of Mrs. Grimes' body from the point of death to the point of abandonment by the killer. It must be borne in mind that this was a double killing and each is so closely related to the other that the facts of one throw light on the other. The fact Mr. Grimes' body and Mrs. Grimes' body were dragged from outside into the house, and the gas turned on with the water heater lighted, intending a blast, devestating fire, charred bodies with consequent elimination of evidence of the crime all bear such an unseverable relation to the whole picture the law would not require them to be separated by the scalpel of legal technicality. It is firmly established in the law that evidence of different offenses from the one charged are

admissible when both offenses are so closely linked as to form a part of the res gestae. Jackson v. State, 42 Okl.Cr. 86, 274 P. 696; Doser v. State, 88 Okl.Cr. 299, 203 P.2d 451–464, citing numerous authorities to support the closely linked theory for admissibility of evidence.

Next the defendant complains of the admission of photographs taken at the scene of the crime. All of these except three were admitted without objection, and one of Mr. Grimes, to which objection was made was so altered before its reception that there can be no question about its admissibility, though such alteration was, in our opinion not necessary. It was a true representation of Mr. Grimes body after the killing. The other two pictures were of Mrs. Grimes, all being part of the same transaction, were admissible as hereinbefore set forth. They were so inseparably a part of the whole crime as to be part and parcel of the conditions left by the perpetrator of this atrocious killing. The Oxendine case (Oxendine v. State, Okl.Cr., 335 P.2d 940) is not this situation at all, and is clearly not applicable herein.

 The telephone call to the Walters operator by one identifying herself as Mrs. Grimes, it is asserted, was not admissible. With this we cannot agree. It was part of the res gestae, a spontaneous declaration of what proved to be a victim, an integral part of the crime itself, undoubtedly the motive for the death of Mrs. Grimes. A doctor could not be called and Mrs. Grimes talk to him without exposing the killing and possibly the killer. It was, like the other evidence, so inextricably bound up with the death of Mr. and Mrs. Grimes as to form a very important link. The case relied on by the defendant of Cumpton v. City of Muskogee, 23 Okl.Cr. 412, 225 P. 562, 565, said the telephone conversation therein involved "was not a spontaneous declaration of a participant or bystander, or an integral part of the crime charged, so as to be a part of the res gestae." Here Mrs. Grimes was a bystander to her husband's death, and provided the motive for her own death by the killer,

as evidenced by her cry for help just after her telephone conversation was closed, though it merely hastened her untimely death, since her knowledge of her husband's murder sealed her doom, it was nonetheless a part of the warp and woof of the crime itself. It was clearly admissible. See Johnson v. Fitzhugh, 91 Or. 247, 178 P. 230, 232, wherein it was said:

"The objection to statements made over a telephone to an unseen party goes not so much to their competency as to their weight, and in most of the precedents on the subject this idea is given prominence. Whether the conversation and participants are identified must, in the nature of things, depend upon circumstances of each case, where there is no direct statement that the voice of the individual at the other end of the line was recognized. But the principle is that the identification of the parties and the conversation may be proved, not only by direct, but also by circumstantial evidence. There must be at least a prima facie showing of a situation equivalent to what would be required if the participants in the conversation were face to face. In other words, the conversation must be such as would be admissible if those talking were in the immediate presence and hearing of each other, and it must be established prima facie, either directly or by circumstantial evidence, that the participants in the telephone conversation are persons whose utterances are competent evidence."

 In Morton v. United States, 7 Cir., 60 F.2d 696–698, speaking of competency of evidence, it was said:

"Competency of testimony is not determined in all cases by rules which define with meticulous accuracy the line that separates rejected from admissible evidence. The trier of fact is seeking the truth. Evidence is receivable to establish the truth. Rules governing materiality and competency are founded on reason and experience. When

the circumstances are such as to attest, with reasonable degree of assurance, the worthiness of such evidence, it is competent. Courts can never certify to the verity of the evidence received. They preliminarily pass on its admissibility and leave the jury to determine its weight. Certain rules are well recognized, such as hearsay, best evidence, admissions, etc. There are, however, other rules wherein the boundary lines are lodged in a twilight zone—when the court's ruling must depend upon what Professor Wigmore aptly calls 'circumstantial trustworthiness.' Cub Fork Coal Co. v. Fairmount Glass Co. (C.C.A.) (7 Cir.) 19 F.2d 273. We therefore conclude that the rule stated in Jones' Commentaries on Evidence should govern the admissibility of such evidence and leave it, when admitted, to the fact finder (jury or court) to determine its weight."

And see Jones Commentaries on Evidence, § 810.

It has been held that evidence of telephone conversations, "If not strictly competent when introduced * * * may be made competent by a consideration of all the testimony". Robilio v. United States, 6 Cir., 291 F. 975, 983, and also the fact a person speaking over the telephone gave his name is some evidence of identification so as to render the evidence competent. Lesnick v. State, 48 Ohio App. 517, 194 N.E. 443.

We are of the opinion that this telephone evidence became competent in light of all the other evidence. Buttressed by the circumstances under which it apparently occurred, and the events which followed, it was clearly admissible. Its weight was a matter for the jury's determination.

Finally, it is contended that counsel for the State made prejudicial remarks in their closing arguments to the jury. We have read the arguments and find them to be reasonably fair discussions of the evidence. In fact, so free from prejudice that the defense counsel made no objection thereto at the trial, or in the motion for new trial, and never moved that they be excluded from the jury's consideration.

It has been repeatedly held that objections must be made to improper argument during the trial, and defendant must go further and move the objectionable argument be stricken from the jury's consideration, unless the remarks were such that they could not be cured by their withdrawal from the jury. Disheroon v. State, Okl. Cr., 357 P.2d 236. No such situation is herewith presented.

The foregoing rule is but a reiteration of what we said in Hathcox v. State, 94 Okl.Cr. 110, 230 P.2d 927–929. In addition thereto we said therein, in syllabus 8:

"Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel."

Such is the situation herein. We do not have the complete argument of counsel made in the case, but only that of the State. Be that as it may, the arguments are not so objectionable as to constitute grounds for reversal and new trial. In fact, they are as free from objectionable matter as most any we have ever examined. Undoubtedly that explains the absence of objections to them when they were made.

For all the foregoing reasons, the judgment and sentence of the district court of Cotton County, Oklahoma, is affirmed.

NIX, P. J., and BUSSEY, J., concur.